**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 21-62380-CIV-SINGHAL**

CITY OF HOLLYWOOD POLICE
OFFICERS' RETIREMENT SYSTEM, on
Behalf of Itself and All Others Similarly
Situated,

            Plaintiff,

   v.

CITRIX SYSTEMS, INC., et al.,

            Defendants.

## DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT AND SUPPORTING MEMORANDUM OF LAW

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ....................................................................................................... 4

I.     CITRIX BEGINS ITS BUSINESS MODEL TRANSFORMATION. ................... 4

II.    CITRIX CREATES BUSINESS CONTINUITY LICENSES IN RESPONSE TO THE PANDEMIC. ....................................................................................... 5

III.   CITRIX'S BUSINESS MODEL TRANSFORMATION ACCELERATES OVER THE PANDEMIC. ........................................................................................... 5

IV.    CITRIX'S ROBUST RISK DISCLOSURES CAUTIONED INVESTORS ON ITS BUSINESS CHALLENGES THROUGHOUT THE PANDEMIC. ................. 6

V.     CITRIX ANNOUNCES Q1 AND Q2 2021 FINANCIAL RESULTS AND LEADERSHIP TRANSITION ........................................................................ 7

ARGUMENT .......................................................................................................... 7

I.     THE AC DOES NOT ALLEGE FACTS RAISING ANY INFERENCE OF SCIENTER, MUCH LESS THE REQUIRED STRONG INFERENCE ................. 8

       A.     The AC Does Not Allege That The Citrix Officers Had Motive And Opportunity To Commit Securities Fraud. ................................................. 10

              1.     The Citrix Officers' Stock Sales Undermine An Inference Of Scienter. ... 10

       B.     The AC Does Not Allege Any Particularized Facts Showing That The Citrix Officers Knew Or Were Severely Reckless In Not Knowing Of Any Material Misstatements Or Omissions. ................................................. 14

              1.     Allegations That The Citrix Officers Made Misstatements Do Not Raise An Inference Of Scienter ......................................................... 14

              2.     Allegations That The Citrix Officers Were Involved In Citrix's Cloud Transition Do Not Raise An Inference Of Scienter. .................. 15

              3.     Allegations That The Citrix Officers Timely Disclosed Negative Results Negate Scienter ......................................................................... 17

       C.     The AC Does Not Allege Scienter As To Citrix.................................... 17

II.    THE AC DOES NOT ALLEGE ANY ACTIONABLE MATERIAL MISSTATEMENTS OR OMISSIONS. ............................................................ 18

       A.     The Challenged Forward-Looking Statements Are Inactionable. ............ 18

              1.     Citrix's SEC Filings And Earnings Calls Included Robust Risk Disclosures. ................................................................................... 19

              2.     The AC Does Not Allege That Any Forward-Looking Statements Were Made With Actual Knowledge That They Were False Or Misleading. ..... 23

       B.     The Challenged Statements Of Opinion Are Inactionable. .................... 23

C.     The AC Does Not Allege That Any Challenged Statements Of Fact Were Materially False Or Misleading At The Time They Were Made..........................24

D.     Defendants Had No Duty To Disclose The Allegedly Omitted Information. ...... 25

     1.     Defendants Had No Duty To Disparage Citrix's Business Model Transformation. ............................................................................. 25

     2.     Defendants Had No Duty To Disclose The Allegedly Omitted Information Under Items 303 Or 105.................................................. 28

III.     THE AC DOES NOT ALLEGE LOSS CAUSATION AS TO THE FINAL CORRECTIVE DISCLOSURE. .......................................................................... 29

CONCLUSION.................................................................................................................... 30

REQUEST FOR HEARING................................................................................................. 31

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acito v. IMCERA Grp., Inc.*,
    47 F.3d 47 (2d Cir. 1995) ...................................................................................14

*Bryant v. Avado Brands, Inc*.,
    187 F.3d 1271 (11th Cir. 1999) .................................................................4, 8, 9

*Carvelli v. Ocwen Fin. Corp*.,
    2018 WL 4941110 (S.D. Fla. Apr. 30, 2018) ........................................................30

*Carvelli v. Ocwen Fin. Corp*.,
    934 F.3d 1307 (11th Cir. 2019) ............................................................23, 24, 28

*City of L.A. v. Bankrate, Inc.*,
    2015 WL 11438106 (S.D. Fla. Nov. 23, 2015)........................................15, 17, 30

*City of St. Clair v. Nationstar Mortg. Holdings Inc.*,
    2016 WL 4705718 (S.D. Fla. June 21, 2016) ...............................................28, 29

*City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*,
    412 F. Supp. 3d 206 (E.D.N.Y. 2019) ......................................................................13

*Cole v. Health Mgmt. Assocs., Inc.*,
    2009 WL 2713178 (M.D. Fla. July 17, 2009) ......................................2, 9, 25, 28

*DoubleLine Capital LP v. Odebrecht Fin., Ltd.*,
    323 F. Supp. 3d 393 (S.D.N.Y. 2018)......................................................................30

*Druskin v. Answerthink, Inc.*,
    299 F. Supp. 2d 1307 (S.D. Fla. 2004) ........................................................ *passim*

*Edward J. Goodman Life Income Tr. v. Jabil Circuit, Inc.*,
    595 F. Supp. 2d 1253 (M.D. Fla. 2009)................................................................17

*Edward J. Goodman Life Income Tr. v. Jabil Circuit, Inc.*,
    594 F.3d 783 (11th Cir. 2010) ................................................................10, 11, 18

*Ehlert v. Singer*,
    245 F.3d 1313 (11th Cir. 2001) ............................................................................18

*In re Galectin Therapeutics, Inc. Sec. Litig.*,
    843 F.3d 1257 (11th Cir. 2016) ............................................................................25

iii

*In re Greenlane Holdings, Inc. Sec. Litig.*,
   511 F. Supp. 3d 1283 (S.D. Fla. 2021) .................................................................28

*Harris v. Ivax Corp.*,
   998 F. Supp. 1449 (S.D. Fla. 1998) .....................................................................18

*Harris v. Ivax Corp.*,
   182 F.3d 799 (11th Cir. 1999) ...............................................................18, 19, 20

*Hubbard v. BankAtlantic Bancorp, Inc.*,
   625 F. Supp. 2d 1267 (S.D. Fla. 2008) .................................................................10

*Janbay v. Canadian Solar, Inc.*,
   2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) .........................................................30

*In re KLX, Inc. Sec. Litig.*,
   232 F. Supp. 3d 1269 (S.D. Fla. 2017) ......................................................... *passim*

*Lorenzo v. SEC*,
   139 S. Ct. 1094 (2019) ........................................................................................29

*In re Med/Waste, Inc.*,
   2000 WL 34241099 (S.D. Fla. Aug. 30, 2000).................................................16, 17

*Mich. Carpenters' Pension Fund v. Rayonier Adv. Materials*, *Inc.*,
   2019 WL 1429667 (M.D. Fla. Mar. 29, 2019) ..................................................4, 26

*Mizzaro v. Home Depot, Inc.*,
   544 F.3d 1230 (11th Cir. 2008) ...........................................................7, 8, 9, 15, 17

*Mogensen v. Body Cent. Corp.*,
   15 F. Supp. 3d 1191 (M.D. Fla. 2014) ......................................................... *passim*

*Mulvaney v. GEO Grp., Inc.*,
   237 F. Supp. 3d 1308 (S.D. Fla. 2017) .................................................................16

*Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enters., Inc.*,
   572 F. App'x 713 (11th Cir. 2014) .........................................................16, 24, 26

*River Birch Capital, LLC v. Jack Cooper Holdings, Corp.*,
   2019 WL 1099943 (S.D.N.Y. Mar. 8, 2019) .........................................................25

*In re Royal Caribbean Cruises Ltd. Sec. Litig.*,
   2013 WL 3295951 (S.D. Fla. Apr. 19, 2013) .........................................................16

*In re Silicon Graphics Inc. Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999) ...............................................................................13

iv

*Silverstrand Invs. v. AMAG Pharm., Inc.*,
    707 F.3d 95 (1st Cir. 2013)...................................................................................29

*In re Smith Gardner Sec. Litig.*,
    214 F. Supp. 2d 1291 (S.D. Fla. 2002) ...........................................................11, 15

*Strougo v. Barclays PLC*,
    105 F. Supp. 3d 330 (S.D.N.Y. 2015)....................................................................30

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)........................................................................................1, 2, 9

*Waterford Twp. Gen. Emps. Ret. Sys. v. BankUnited Fin. Corp.*,
    2010 WL 1332574 (S.D. Fla. Mar. 30, 2010)........................................................12

*Yates v. Mun. Mortg. & Equity, LLC*,
    744 F.3d 874 (4th Cir. 2014) .................................................................................13

## Statutes

Federal Rule of Civil Procedure 9(b)...........................................................1, 8, 24, 25

Federal Rule of Civil Procedure 12(b)(6) ................................................................1

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 *et seq.* ..................... *passim*

Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ............................................ *passim*

Securities Exchange Act of 1934, 15 U.S.C. § 78t(a)...............................................3, 8

Securities Exchange Act of 1934, 15 U.S.C. § 78u-5(c) ...........................................18

Securities Exchange Act of 1934, 15 U.S.C. § 78u-5(c)(1)(A)(i) ................................20

Securities Exchange Act of 1934, 15 U.S.C. § 78u-5(i)(1) ........................................18

## Other Authorities

FAST Act Modernization and Simplification of Regulation S-K,
    84 Fed. Reg. 12764, 12688-89 (April 2, 2019)......................................................28

SEC Rule 10b-5, 17 C.F.R. § 240.10b5-1 ............................................... *passim*

Defendants Citrix Systems, Inc. ("Citrix"), David J. Henshall, Robert M. Calderoni, Arlen Shenkman, PJ Hough, and Mark J. Schmitz (the "Citrix Officers," and together with Citrix, "Defendants") respectfully move to dismiss the Amended Complaint (ECF No. 62) (the "AC") with prejudice pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b).

## PRELIMINARY STATEMENT

Plaintiffs' opportunistic AC should be dismissed because it fails to satisfy the strict pleading requirements of Rule 9(b) and the PSLRA. As the Supreme Court has recognized, "[p]rivate securities fraud actions, . . . if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). "Exacting pleading requirements are among the control measures Congress included in the PSLRA." *Id.* To satisfy the PSLRA, the AC must "*state with particularity* both *the facts constituting the alleged violation*, and *the facts evidencing scienter*." *Id.*[1] It does neither. "The mere magnitude of [the AC] does not assure that the heightened pleading requirements under the Reform Act have been met." *Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1324-25 (S.D. Fla. 2004). Although the AC spans 118 pages and 277 separately numbered paragraphs, it fails to plead particularized facts showing *either* (1) a material misstatement or omission or (2) scienter, and should be dismissed in its entirety.

Citrix is an enterprise software company that provides digital workspaces to allow its customers' workforces to work from anywhere. At the start of the COVID-19 pandemic, Citrix was in the process of transforming its business model (1) from delivering products to platforms, (2) from selling perpetual licenses to subscription licenses, and (3) from providing "on-premise"

---

[1] Unless otherwise noted, all emphasis is added and all internal quotation marks are omitted.

solutions to remote "cloud" or "SaaS" solutions. To help its customers navigate the unprecedented demands of the pandemic, Citrix developed and sold Business Continuity Licenses—on-premise subscription licenses intended to last up to one year. The Business Continuity Licenses increased Citrix's subscription revenue early in the pandemic, but Citrix hoped to convert those customers to longer term cloud subscriptions when the terms of the Business Continuity Licenses ended in Q1 2021. Although Citrix's overall cloud transition accelerated over the pandemic, Citrix converted fewer Business Continuity Licenses than it had hoped, and its recognized revenue in Q1 2021 came in below guidance, *i.e.*, what Citrix told investors it expected. Citrix's cloud transition continued to accelerate in Q2 2021, but its recognized revenue again came in below guidance because of lower than anticipated SaaS subscription bookings due to sales execution challenges.

Plaintiffs' theory is that Defendants failed to accurately predict Citrix's Q1 and Q2 2021 financial performance. That is not securities fraud. Plaintiffs allege that Defendants misled investors by assuring them in 2020 and early 2021 that Citrix's business model transformation "was going smoothly and that the Company could attain its financial targets." AC ¶ 4. Plaintiffs further allege that at the same time, that transformation faced challenges based on "the failure of Citrix to convert customers that bought Business Continuity Licenses to the cloud," "weakened relationships with Citrix's partners [who resell Citrix's solutions]," and "significant complications within the Company's sales organization." *Id.*

These allegations fail to state a claim under Section 10(b) of the Securities Exchange Act of 1934, or Rule 10b-5, because under the Supreme Court's *Tellabs* mandatory balancing test that the Court must conduct, the non-culpable inference that Citrix was "confronting a deterioration in the business and finding itself unable to prevent it" is much more compelling than the inference that Defendants were "recklessly deceiving the investing community." *See Cole v. Health Mgmt. Assocs., Inc.*, 2009 WL 2713178, at *9 (M.D. Fla. July 17, 2009). The AC should be dismissed in

its entirety for two independent reasons: *First*, the AC fails to plead particularized facts raising *any* inference of scienter—much less the requisite *strong* inference. Absent are any allegations attributed to confidential witnesses, internal reports, emails, or other documents suggesting that any Citrix Officer knew or recklessly disregarded that Citrix's business model transformation was not proceeding as described or that Citrix could not attain its financial targets. Instead, Plaintiffs attempt to plead scienter based on the allegation that the Citrix Officers had motive and opportunity to commit securities fraud. In this Circuit, that is not enough. Furthermore, Plaintiffs' allegation that the Citrix Officers sold shares of Citrix common stock during the alleged Class Period is not enough to plead even motive and opportunity. Plaintiffs' remaining boilerplate scienter allegations could describe any corporate officers and fail, as a matter of law, to allege scienter. *Second*, the AC fails to allege any actionable misstatements or omissions. The vast majority of the challenged statements in the AC are inactionable because they are (1) forward-looking statements regarding Citrix's business model transformation and its financial targets that are immunized by the PSLRA's safe harbor, (2) statements of opinion truly held by the speaker that do not contain embedded false facts, and/or (3) "puffery," optimistic statements on which no reasonable investor would rely. The remaining challenged statements are inactionable because the AC does not allege that they were false or that they were misleading in light of any omitted material information. At most, Plaintiffs attempt to allege that Citrix had a "duty to disparage" its business model transformation. But no such duty exists under federal securities law, and Citrix disclosed "hard data" from which investors could make their own decisions regarding whether to invest in Citrix.

Because Plaintiffs fail to allege a primary violation of Section 10(b) or Rule 10b(5), their Section 20(a) claim also should be dismissed. Plaintiffs also are prohibited from seeking damages based on any disclosures after Citrix's Q2 2021 earnings announcement because those disclosures did not reveal to investors an allegedly undisclosed truth.

3

**BACKGROUND**

I.      **CITRIX BEGINS ITS BUSINESS MODEL TRANSFORMATION.**

Citrix is an enterprise software company that offers "a digital workspace that provides unified, secure, and reliable access to all applications and content employees need to be productive – anytime, anywhere, on any device." 2019 Form 10-K, Ex. H, at 3.[2] Citrix "market[s] and license[s] [its] solutions through multiple channels worldwide, including selling through resellers, direct and over the Web." 2019 Form 10-K, Ex. H, at 7. It sells its "solutions in intensely competitive markets," and "[s]ome of [its] competitors and potential competitors have significantly greater financial, technical, sales and marketing, and other resources." *Id.* at 8. To remain competitive, Citrix has been transforming its business by transitioning (1) "from delivering products to platforms," (2) from selling "perpetual to subscription" licenses, and (3) from providing "on-premise" solutions to "cloud" solutions. Q4 2019 Letter, Ex. E, at 3. As Citrix explained:

> The subscription model transition serves as a bridge from legacy on-premises perpetual license and maintenance to the cloud. The interim step that has quickly gained traction is on premises term subscriptions . . . . This option allows customers to continue to utilize the infrastructure in which they've already invested and – when acquired with hybrid rights – allows them to transition to the cloud at their own rate.

Q2 2020 Letter, Ex. M, at 3. Citrix measures progress in its business model transformation using, among other metrics, "subscription ARR" and "SaaS ARR." Q4 2019 Letter, Ex. E, at 3. "ARR," or Annualized Recurring Revenue, "is an operating metric that represents the contracted recurring value of all termed subscriptions normalized to a one-year period." *Id.* at 1. "[S]ubscription

---

[2] The Court may consider the exhibits attached to the Birnbach Declaration, which are referenced in the AC and/or filed with the SEC. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276 (11th Cir. 1999) (considering relevant documents "publicly filed with the SEC at the motion to dismiss stage"); *Mich. Carpenters' Pension Fund v. Rayonier Adv. Materials*, *Inc.*, 2019 WL 1429667, at *2 (M.D. Fla. Mar. 29, 2019) ("press releases, conference call transcripts and analyst reports" central to complaint "properly considered" at the motion to dismiss stage).

revenue includes [both] SaaS . . . and non-SaaS" revenue. 2019 Form 10-K, Ex. H, at 38. "[H]ybrid subscription offerings are allocated between SaaS and non-SaaS." *Id.* Citrix cautioned investors that "[e]xecuting three simultaneous but interrelated transformations has required a heightened level of coordination and alignment across the organization." Q4 2019 Letter, Ex. E, at 3.

## II.   CITRIX CREATES BUSINESS CONTINUITY LICENSES IN RESPONSE TO THE PANDEMIC.

To help its "customers manage through the shock to the system created by the pandemic," Citrix created new Business Continuity Licenses—"shorter (up to 1-year) duration on-premises term subscription license[s] at discounted prices." Q1 2020 Letter, Ex. I, at 2. Although Citrix's decision to create this new type of license "increased subscription revenue," Citrix began to stop offering them at the end of April 2020. Q1 2020 Form 10-Q, Ex. K, at 36, 38. As Henshall told investors on April 23, 2020, Citrix hoped "to transition [the Business Continuity Licenses] into more permanent long-term cloud licenses" because it believed that would "be the right decision for customers." Q1 2020 Earnings Call Tr., Ex. J, at 7.

## III.   CITRIX'S BUSINESS MODEL TRANSFORMATION ACCELERATES OVER THE PANDEMIC.

During the pandemic, Citrix's business model transformation accelerated in terms of both subscription ARR and SaaS ARR. Between Q4 2019 and Q2 2021, subscription ARR increased from $743 million to $1.65 billion, and the rate at which subscription ARR increased grew from 41% year-over-year to 74% year-over-year. Q4 2019 Letter, Ex. E, at 1; Q2 2021 Letter, Ex. FF, at 5. Between Q4 2019 and Q2 2021, SaaS ARR increased from $520 million to $868 million, exclusive of the impact of Citrix's acquisition of Wrike, Inc ("Wrike"). Q4 2019 Letter, Ex. E, at 1; Q2 2021 Letter, Ex. FF, at 5. Although the rate at which SaaS ARR increased slowed from 41% year-over-year in Q4 2019 to 36% year-over-year in Q3 2020, it grew again to 47% year-over-year in Q2 2021, again exclusive of the impact of Wrike. Q4 2019 Letter, Ex. E, at 1; Q3 2020

Letter, Ex. Q, at 1; Q2 2021 Letter, Ex. FF, at 5.

## IV.   CITRIX'S ROBUST RISK DISCLOSURES CAUTIONED INVESTORS ON ITS BUSINESS CHALLENGES THROUGHOUT THE PANDEMIC.

During the pandemic, Citrix transparently warned investors of the risks it faced in completing its business model transformation and meeting its financial targets.[3] For example, just before the pandemic, Citrix cautioned investors that its:

> forward-looking statements are subject to a number of risks and uncertainties that could cause actual results to differ materially from those anticipated by the forward-looking statements, including, without limitation, risks associated with our ability to advance our transformation from perpetual to subscription and from on-premise to cloud, including our ability to deepen our subscription customer relationships; . . . our ability to forecast our future financial performance during our business model transition; . . . risks associated with the expansion of cloud-delivered services; . . . changes in Citrix's pricing and licensing models, promotional programs and product mix, all of which may impact Citrix's revenue recognition; . . . failure to execute Citrix's sales and marketing plans; failure to successfully partner with key distributors, resellers, system integrators, service providers and strategic partners, such as Microsoft; . . . and other risks detailed in Citrix's filings with the [SEC].

Q4 2019 Letter, Ex. E, at 13-14. Citrix revised its risk disclosures in light of changing circumstances. For example, in April 2020, Citrix disclosed that its "forward-looking statements are subject to a number of risks and uncertainties, including, . . . changes in Citrix's pricing and licensing models, *including our short-term license program*, promotional programs and product mix, all of which may impact Citrix's revenue recognition." Q1 2020 Letter, Ex. I, at 15.

Citrix's 2019 and 2020 Forms 10-K, in particular, included comprehensive risk disclosures regarding its business model transformation and financial targets, including specific risk disclosures regarding its cloud transition, channel partners, and sales strategy, which were incorporated into subsequent SEC filings. For example, those Forms 10-K include approximately one page of disclosures regarding Citrix's transition to subscription licenses, approximately one page of disclosures regarding its transition to cloud solutions, multiple paragraphs of disclosures

---

[3] Citrix's risk disclosures during the alleged Class Period are attached as exhibits to the Birnbach Declaration and, for the Court's convenience, excerpted on the Disclosures Chart, Exhibit B.

regarding its channel relationships, and numerous disclosures regarding its sales strategy. 2019 Form 10-K, Ex. H, at 11-12, 20; 2020 Form 10-K, Ex. Y, at 13-14, 21. Although these disclosures identify the risks Plaintiffs allege occurred, they are not referenced anywhere in the AC.

## V.   CITRIX ANNOUNCES Q1 AND Q2 2021 FINANCIAL RESULTS AND LEADERSHIP TRANSITION.

On April 29, 2021, Citrix announced that its Q1 2021 revenue was $776 million and that its GAAP diluted EPS was $0.71, explaining that "[d]espite strong underlying metrics for bookings and ARR, recognized revenue came in below our expectations due to: . . . duration of on-premises term licenses that did not extend to the degree we expected." Q1 2021 Letter, Ex. CC, at 2.  On July 29, 2021, Citrix announced that its Q2 2021 revenue was $812 million, attributing that to (1) "unexpected sales process complexity in effectively supporting multiple, simultaneous selling motions for Workspace cloud and on-premises solutions, [which] created bookings mix uncertainty," (2) being behind Citrix's "capacity plan for direct quota carriers, [which] limit[ed] capacity," and (3) lacking "focus in driving transaction volume through the channel." Q2 2021 Letter, Ex. FF, at 1-2. On October 6, 2021, Citrix announced that Calderoni would succeed Henshall as Citrix's Interim President and CEO and would remain in his current role of Chairman of the Board. Oct. 6, 2021 Form 8-K, Ex. GG, at 1-2. Citrix also announced that Henshall and Dr. Ajei Gopal (due to a potential conflict of interest) had resigned as members of Citrix's Board of Directors and that it was postponing an upcoming analyst meeting. *Id.* at 1.

## ARGUMENT

To state a claim under Section 10(b) and Rule 10b-5, Plaintiffs must adequately allege, among other things, (1) "a material misrepresentation or omission," (2) "made with scienter," and (3) "a causal connection between the material misrepresentation or omission and the loss, [*i.e.*] 'loss causation.'" *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236-37 (11th Cir. 2008). The AC

must satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA. *Id.* at 1237-38. This Circuit has recognized that the pleading requirements of the PSLRA serve "[a]s a check against abusive litigation by private parties." *Id.* "First, the PSLRA slightly altered Rule 9(b)'s particularity requirement by mandating that a securities fraud complaint specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omissions is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* at 1238. "Second, and more importantly, the PSLRA raised the standard for pleading scienter. . . . [T]he complaint shall, with respect to each act or omission alleged . . . , *state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind*." *Id.* The AC falls well short of satisfying these strict pleading requirements.[4]

## I.   THE AC DOES NOT ALLEGE FACTS RAISING ANY INFERENCE OF SCIENTER, MUCH LESS THE REQUIRED STRONG INFERENCE.

An inference of scienter—*i.e.*, an intent to deceive, manipulate, or defraud or severe recklessness—is only strong if it is "'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Id.* (quoting *Tellabs*, 551 U.S. at 324).[5] "Because the strong-inference inquiry asks 'whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard,' 'courts must consider the complaint in its entirety,' and '*omissions and ambiguities count against inferring scienter*.'" *Mizzaro*, 544 F.3d at 1238-39 (quoting *Tellabs*, 551 U.S. at 322-23, 326). And the "complaint must allege facts supporting a strong inference of scienter for each

---

[4] Because the AC fails to allege a primary violation of Section 10(b) and Rule 10b-5, the Section 20(a) claims must be dismissed. *Id.* at 1237.

[5] "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but *an extreme departure* from the standards of ordinary care . . . ." *Bryant*, 187 F.3d at 1282 n.18.

defendant with respect to each violation." *Id.* at 1238. "In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs*, 551 U.S. at 326.

Here, the Supreme Court's mandatory *Tellabs* balancing test is straightforward. Because Plaintiffs' allegations fail to raise *any* inference of scienter, the opposing inference—that the strategy Citrix disclosed for transforming its business model during a global pandemic encountered unexpected setbacks in overcoming the challenges Citrix identified—is not only more compelling, it is the *only* inference that can be drawn. *See Cole*, 2009 WL 2713178, at *7.

The AC does not cite to any witnessed conversations, reports, emails, or other documents as typically alleged to raise a strong inference of scienter. Instead, Plaintiffs primarily attempt to plead scienter by the Citrix Officers by alleging motive and opportunity to commit securities fraud. Plaintiffs allege that the Citrix Officers had "motive to misrepresent and conceal the truth about the Company's financial problems" because "[t]hey collectively sold more than $24 million of their personally held Citrix shares . . . throughout the Class Period." AC ¶ 63 (emphasis omitted). But this Circuit has "reject[ed] the notion that allegations of motive and opportunity to commit fraud, standing alone, are sufficient to establish scienter." *Bryant*, 187 F.3d at 1285. "[M]otives such as greed can be ascribed to any company insider and are thus fundamentally inconsistent with the provisions of the [PSLRA] that require allegations of specific facts that establish scienter." *Druskin*, 299 F. Supp. 2d at 1335. Even if allegations of motive and opportunity could suffice, Plaintiffs fail to allege any facts showing that the Citrix Officers' sales of Citrix common stock were suspicious as to timing and amount, and in fact, the circumstances surrounding their stock sales confirms that there was nothing at all suspicious about them.

Similarly, the remainder of Plaintiffs' scienter allegations—that the Citrix Officers were involved with and made statements regarding Citrix's business model transformation, were high-

ranking officers and directors, signed SOX certifications, had access to data regarding the business model transformation, and acknowledged that Citrix underperformed its expectations—are boilerplate allegations that fail for a similar reason: they could describe the corporate officers of any public company and fall well short of satisfying the heightened pleading requirements of the PSLRA. "These are precisely the types of vague allegations that the PSLRA was meant to curtail." *Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1220 (M.D. Fla. 2014).

### A. The AC Does Not Allege That The Citrix Officers Had Motive And Opportunity To Commit Securities Fraud.

#### 1. The Citrix Officers' Stock Sales Undermine An Inference Of Scienter.

Plaintiffs primarily argue that the Citrix Officers had scienter because they "were highly motivated to misrepresent and omit material facts concerning the true financial and operating condition of Citrix in order to artificially inflate the price of Citrix's common stock, enabling them to capitalize on the artificial inflation by selling their personal shares of Citrix's common stock." AC ¶ 239. Specifically, Plaintiffs allege that during the Class Period:

- Henshall sold a total of 114,314 shares for approximately $14.4 million in proceeds;

- Calderoni sold a total of 29,591 shares for approximately $4.3 million in proceeds;

- Shenkman sold a total of 9,386 shares for approximately $1.1 million in proceeds;

- Hough sold a total of 8,000 shares for approximately $1 million in proceeds; and

- Schmitz sold a total of 25,700 shares for approximately $3.4 million in proceeds.

*Id.* at ¶¶ 242-46. These allegations fail because nothing about the stock sales is suspicious.

"Stock sales by insiders are only relevant to scienter when they are suspicious." *Edward J. Goodman Life Income Tr. v. Jabil Circuit, Inc.*, 594 F.3d 783, 793 (11th Cir. 2010). They are only suspicious "when they are dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Hubbard v. BankAtlantic Bancorp, Inc.*, 625 F. Supp. 2d 1267, 1287 (S.D. Fla. 2008). To determine whether stock sales are

10

suspicious, "a court may look to: (1) the amount and percentage of shares sold; (2) the timing of the sales; and (3) the consistency between the sales and the insider's prior trading history." *In re Smith Gardner Sec. Litig.*, 214 F. Supp. 2d 1291, 1303 (S.D. Fla. 2002). If an individual defendant sold more stock in the time preceding the class period than during the class period, "[t]his fact alone strongly cuts against an inference of scienter." *Mogensen*, 15 F. Supp. 3d at 1222. Likewise, if "class-period stock sales were automatic sales made pursuant to Rule 10b5-1 trading plans," that too "negat[es] any inference of scienter." *Id.*

Plaintiffs "bear the burden of showing that sales by insiders were in fact unusual or suspicious in amount and in timing." *Druskin*, 299 F. Supp. 2d at 1335. Plaintiffs fail to carry that burden here because they fail "to plead any information about any [Citrix Officer's] trading history before the class period," and "there is no way to determine from the complaint that the sales of [even] large numbers of shares is suspicious enough to add to an inference of scienter." *Jabil Circuit*, 594 F.3d at 793. Such "conclusory allegations of insider trading" should be given "*no weight* in considering the inference of scienter raised by the complaint." *Id.* For this reason alone, Plaintiffs have failed to allege motive and opportunity as to any Citrix Officer.

The reason Plaintiffs fail to allege any stock sales by the Citrix Officers before the alleged Class Period is plain: the Citrix Officers' trading patterns demonstrate that there was nothing suspicious about their stock sales during the Class Period and undercut any inference of scienter.

*First*, all of the shares of Citrix common stock allegedly sold by Henshall, Hough, and Schmitz during the alleged Class Period were sold pursuant to 10b5-1 trading plans.[6] That alone shows that there is nothing suspicious about their stock sales. *See Mogensen*, 15 F. Supp. 3d at

---

[6] The SEC Forms 4 reflecting the Citrix Officers' stock sales show that all of their Class Period sales were made pursuant to trading plans, except Calderoni's sales on May 5, 2020, and Shenkman's sales on February 1, 2021. *See* Henshall Chart, Ex. HH, at 2-3; Calderoni Chart, Ex. II, at 2; Shenkman Chart, Ex. JJ, at 1-2; Hough Chart, Ex. KK, at 2; Schmitz Chart, Ex. LL, at 2.

1222 ("[A]ll of the class period stock sales were automatic sales pursuant to Rule 10b5-1 trading plans, thus negating any inference of scienter.") Stock sales pursuant to 10b5-1 trading plans can only be suspicious where "the trading plan was adopted during the class period and the plaintiff alleges with particularity facts showing that the defendant was aware of an impending price drop at the time the plan was adopted." *Id.* Because the AC does not even mention any trading plans, Plaintiffs have failed to allege any facts showing that any of the Citrix Officers was aware of an impending decline in Citrix's stock price at the time they adopted their trading plans.

*Second*, because Calderoni, Henshall, and Hough sold substantial amounts of Citrix common stock during the 89 weeks prior to the Class Period—and in Calderoni's and Hough's cases more than they did during the 89-week Class Period—their stock sales are not suspicious. Specifically, Calderoni sold 51,738 shares of Citrix common stock prior to the Class Period and only 29,591 shares during the Class Period, and Hough sold 10,944 shares of Citrix common stock prior to the Class Period and only 8,000 shares during the Class Period.[7] That they both sold more Citrix common stock in the 89 weeks prior to the Class Period "strongly cuts against an inference of scienter." *See Mogensen*, 15 F. Supp. 3d at 1222. Similarly, Henshall sold 73,293 shares of Citrix common stock prior to the Class Period for proceeds of approximately $7.49 million and 114,314 shares during the Class Period for proceeds of approximately $14.45 million.[8] Although Henshall realized approximately 52% lower proceeds from his stock sales before the Class Period, his Class Period stock sales are not suspicious because he still sold substantial amounts of shares both prior to and during the Class Period. *See Waterford Twp. Gen. Emps. Ret. Sys. v. BankUnited Fin. Corp.*, 2010 WL 1332574, at *14 (S.D. Fla. Mar. 30, 2010) (stock sales not suspicious where gross proceeds from stock sales prior to the class period sales were 60% less than gross proceeds

---

[7] AC ¶¶ 243, 245; Calderoni Chart, Ex. II, at 1; Hough Chart, Ex. KK, at 1.
[8] AC ¶ 242; Henshall Chart, Ex. HH, at 1.

from stock sales during the class period). For these reasons too, Calderoni's, Hough's, and Henshall's Class Period stock sales fail to raise any inference of scienter.[9]

*Third*, almost all of the Citrix Officers sold shares of Citrix common stock at regular intervals throughout the Class Period, further undermining any inference of scienter:

- Henshall sold between 2,000 and 8,000 shares of every month starting in April 2019 and continuing throughout the Class Period (Henshall Chart, Ex. HH, at 2-3);

- Hough sold exactly 2,000 shares every quarter between June 10, 2020, and March 8, 2021, during the Class Period (Hough Chart, Ex. KK, at 2);

- Schmitz sold between 732 and 6,667 shares in October, January, February, March, and April, both before and during the Class Period (Schmitz Chart, Ex. LL, at 2); and

- Shenkman sold either 673 or 935 shares every month starting on October 2, 2020, and continuing throughout the Class Period, (Shenkman Chart, Ex. JJ, at 1-2).

Because these Citrix Officers' sales of Citrix common stock occurred at "fairly regular intervals and amounts as compared to earlier periods," they do not support any inference of scienter. *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 891 (4th Cir. 2014). In fact, Henshall and Shenkman sold shares of Citrix common stock on May 3 and August 2, 2021—"after the [alleged] corrective disclosures" on April 29 and July 29, 2021—which refutes any inference of scienter. *City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*, 412 F. Supp. 3d 206, 227 (E.D.N.Y. 2019).

*Fourth*, the Citrix Officers increased, or retained a significant percentage of, their holdings

---

[9] Because Shenkman and Schmitz did not assume their roles until shortly before the Class Period, their Class Period stock sales cannot be compared to their stock sales before the Class Period. *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 987 (9th Cir. 1999) (senior vice president's stock sales not suspicious where he had no significant trading history for the purposes of comparison because he had joined the company one year earlier), *superseded by statute on other grounds as recognized in In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1146 (9th Cir. 2017). Shenkman did not join Citrix until September 9, 2019, shortly before the Class Period, (Aug. 19, 2019 Form 8-K, Ex. D, at 2), and his first reported sale of Citrix stock was not until October 2, 2020, over a year later (Shenkman Chart, Ex. JJ, at 1). Schmitz did not become COO until July 23, 2019, shortly before the Class Period (July 24, 2019 Form 8-K, Ex. C, at 2), and his first reported sale of Citrix stock was not until October 25, 2019 (Schmitz Chart, Ex. LL, at 3).

of Citrix common stock during the Class Period. Henshall, Hough, and Schmitz increased their holding by 2.3%, 54.2%, and 17.1%, respectively, during the Class Period, and Calderoni and Shenkman reduced their holdings by 32.7% and 5.8%, respectively.[10] Courts in this Circuit have held that the sale of "approximately 11%" and "17% of [an] insider's holdings did not support an inference of scienter." *See Druskin*, 299 F. Supp. 2d at 1336.  That the Citrix Officers increased, or retained much of, their equity in Citrix negates any inference of scienter. *See Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (no scienter where defendant sold 11% of holdings).

For all of these reasons, the Citrix Officers' stock sales undermine an inference of scienter.

**B.    The AC Does Not Allege Any Particularized Facts Showing That The Citrix Officers Knew Or Were Severely Reckless In Not Knowing Of Any Material Misstatements Or Omissions.**

**1.    Allegations That The Citrix Officers Made Misstatements Do Not Raise An Inference Of Scienter.**

Plaintiffs attempt to buttress their inadequate allegations of motive and opportunity with boilerplate allegations that the Citrix Officers had scienter because they made statements "to the investing public concerning the Company's business model transition and financial results related thereto" while they held positions as "high-ranking officers and directors" of Citrix and/or signed SOX certifications. AC ¶¶ 234-36. Alone or together, those allegations fail to raise any inference that the Citrix Officers had scienter.

The AC's allegation that "by choosing to speak about [business model transition and financial results related thereto], [the Citrix Officers] led investors to believe that they had knowledge of such matters" fails to raise any inference of scienter. *Id*. at ¶ 235. Allegations that a

---

[10] Henshall Chart, Ex. HH, at 9; Calderoni Chart, Ex. II, at 6; Shenkman Chart, Ex. JJ, at 4; Hough Chart, Ex. KK, at 4; Schmitz Chart, Ex. LL, at 5. The stock holdings reflected on the Citrix's Officers' SEC Forms 4 include any unvested time-based stock awards but do not include any unvested performance-based stock awards. If unvested performance-based stock awards were included, the Citrix Officers' retained holdings of Citrix common stock would be even greater.

defendant "spoke intelligently" about a topic are insufficient to allege scienter. *In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1282 (S.D. Fla. 2017).

Likewise, the AC's allegation that because of their roles as "high-ranking officers and directors," the Citrix Officers "were intimately aware of the financial condition of the Company, including the Company's transition to a subscription, cloud-based business model and the Company's bookings and revenue related to the transition" adds nothing to support an inference of scienter. AC ¶ 234. Courts in this Circuit have consistently held that "[m]ere allegations that Defendants held senior management positions, had access to inside information, and therefore must have known of the falsity of certain statements is insufficient to plead scienter." *Smith Gardner*, 214 F. Supp. 2d at 1303; *accord Mogensen*, 15 F. Supp. 3d at 1220.

Same too for the AC's allegation that because they executed "Certifications of the Company's SEC Forms 10-Q and Forms 10-K," Henshall and Shenkman had "knowledge or reckless disregard of the materially false and misleading statements and omissions contained therein." AC ¶ 236. A SOX certification is "only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statement." *Mizzaro*, 544 F.3d at 1252. Because Plaintiffs do not allege any "glaring accounting irregularities" or "red flags," Henshall's and Shenkman's certifications "do not support an inference of scienter." *Id.*; *accord City of L.A. v. Bankrate, Inc.*, 2015 WL 11438106, at *8 (S.D. Fla. Nov. 23, 2015).

  **2. Allegations That The Citrix Officers Were Involved In Citrix's Cloud Transition Do Not Raise An Inference Of Scienter.**

Plaintiffs also allege that the Citrix Officers had scienter because they "specifically acknowledged that they had access to, and were continuously monitoring, reviewing, and evaluating, precise data relating to the Company's transition to subscription and cloud products and their effect on the Company's bookings, revenue, and margins." AC ¶ 237. The AC alleges

15

nothing of the sort. None of the twenty example statements the AC lists includes an acknowledgement that any Citrix Officer was "continuously monitoring . . . precise data," what that data was, or what it showed, and none of those statements was made by Calderoni. *See id.* In any event, that is not enough. "Defendants' public statements of how they reviewed revenue and bookings reports are . . . inadequate to establish scienter [where] there is no allegation that such reports demonstrated that the Company's guidance was false or misleading." *In re Royal Caribbean Cruises Ltd. Sec. Litig.*, 2013 WL 3295951, at *19 (S.D. Fla. Apr. 19, 2013). "Otherwise, any executives working at a company with an internal reporting system would work at their peril. To impute knowledge of or extremely reckless disregard for the truth from the mere existence of an internal reporting system, and the mere active engagement of management, would allow almost any securities fraud case to proceed into discovery." *Mogensen*, 15 F. Supp. 3d at 1220. Plaintiffs must allege with particularity "what information [the Citrix Officers] actually received." *Mulvaney v. GEO Grp., Inc.*, 237 F. Supp. 3d 1308, 1324 (S.D. Fla. 2017); *see also In re Med/Waste, Inc.*, 2000 WL 34241099, at *7 (S.D. Fla. Aug. 30, 2000) (no scienter where defendant was not "privy to *specific* information that revealed that the three quarterly reports for the 1998 fiscal year were false and misleading at the time they were issued"). Plaintiffs do not.

Plaintiffs also allege that the Citrix Officers' "close monitoring of the Company's business model transition is further supported by the fact that their incentive compensation was tied to its success." AC ¶ 238. This allegation also fails. "[A] personal financial incentive, standing alone, is insufficient to establish a strong inference of actual fraud." *Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enters., Inc.*, 572 F. App'x 713, 718 (11th Cir. 2014). Allegations that an officer "received an incentive-based compensation plan, could be ascribed to virtually all corporate officers and directors and thus fail[] to raise a strong inference of scienter." *Druskin*, 299 F. Supp. 2d at 1338. Only "[w]hen financial incentives to exaggerate earnings go far beyond the usual arrangement of

16

compensation based on the company's earnings, . . . may [they] be considered among other facts to show scienter." *Id.* at 1335. Because the AC fails to allege what any Citrix Officer's incentive compensation was, much less that their compensation was somehow "extraordinary," Plaintiffs' allegation fails to raise any inference of scienter. *See Edward J. Goodman Life Income Tr. v. Jabil Circuit, Inc.*, 595 F. Supp. 2d 1253, 1275 (M.D. Fla. 2009), *aff'd*, 594 F.3d 783 (11th Cir. 2010).

> ### 3.      Allegations That The Citrix Officers Timely Disclosed Negative Results Negate Scienter.

Plaintiffs also allege that the Citrix Officers had scienter because they "admitted that the same data they were closely monitoring, reviewing, and evaluating showed far more negative results regarding the Company's business model transition than they had . . . stated throughout the Class Period." AC ¶ 247. That is nonsense. None of the purported admissions identified in the AC (which are attributed only to Calderoni or Henshall) is an actual admission that any Citrix Officer knew that any challenged statement was false or misleading *at the time it was made. See id.* Acknowledging that Citrix later underperformed its expectations and identifying the reasons why is not securities fraud, and these allegations negate any inference of scienter. *See Med/Waste*, 2000 WL 34241099, at *8 ("That Defendants revised and restated Med/Waste's previously reported financial figures, even to a great extent, provides no indication how or when Defendants became aware of the falsity of the original statements."); *accord Mogensen*, 15 F. Supp. 3d at 1223 (no scienter where defendants "timely disclosed adverse information as they became aware of it").

> ### C.      The AC Does Not Allege Scienter As To Citrix.

To allege scienter as to Citrix, the AC must plead that "[Citrix] officials were both responsible for issuing the allegedly false public statements and were aware of the alleged fraud." *Mizzaro*, 544 F.3d at 1254-55. Because the AC fails to raise a strong inference of scienter as to the Citrix Officers, and fails to identify any other Citrix official who made a challenged statement with scienter, it fails to raise a strong inference as to Citrix. *See Bankrate*, 2015 WL 11438106, at *8;

*Mogensen*, 15 F. Supp. 3d at 1224. Plaintiffs' claims against Citrix should be dismissed as well.

## II.   THE AC DOES NOT ALLEGE ANY ACTIONABLE MATERIAL MISSTATEMENTS OR OMISSIONS.

### A.   The Challenged Forward-Looking Statements Are Inactionable.

The majority of the challenged statements are forward-looking statements that are immunized by the PSLRA's safe harbor. To encourage companies to be transparent, under the statutory safe harbor, "a forward-looking statement cannot as a matter of law be the basis of liability under Section 10(b) if either the forward-looking statement is accompanied by meaningful cautionary language, or the plaintiff fails to prove that the person making the statement made it with actual knowledge that the statement was false or misleading." *Harris v. Ivax Corp.*, 998 F. Supp. 1449, 1452 (S.D. Fla. 1998), *aff'd*, 182 F.3d 799 (11th Cir. 1999); *see* 15 U.S.C. § 78u-5(c). "Even if the forward-looking statement has no accompanying cautionary language, the plaintiff must prove that the defendant made the statement with actual knowledge that it was false or misleading." *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir. 1999). Conversely, "an allegation that the speaker knew the statements were false does not convert [forward-looking] statements, mitigated by adequate warnings of risks, into actionable frauds." *Jabil Circuit*, 594 F.3d at 796. This demanding requirement applies at the pleading stage, and courts within this Circuit have not hesitated to dismiss complaints that failed to satisfy it. *See, e.g.*, *KLX*, 232 F. Supp. 3d at 1280-81.

Forward-looking statements include projections of "financial items," "plans and objectives of management for future operations," statements of "future economic performance," and statements of the assumptions underlying or relating to projections of financial items, plans and objectives of management for future operations, and statements of future economic performance. 15 U.S.C. § 78u-5(i)(1). Present-tense statements with forward-looking connotations are considered forward looking. *Ehlert v. Singer*, 245 F.3d 1313, 1318 n.5 (11th Cir. 2001). Similarly, "when the factors underlying a projection or economic forecast include both assumptions and

statements of known fact, and a plaintiff alleges that a material factor is missing, the entire list of factors is treated as a forward-looking statement." *Harris*, 182 F.3d at 807.

Here, all of the challenged forward-looking statements in the AC are forward-looking because they are statements regarding Citrix's business model transformation and financial targets, including Citrix's plans to transition customers from Business Continuity Licenses to the cloud, expand and enhance its network of partners, and increase sales of cloud subscriptions by changing its sales incentives.[11] Courts in this Circuit consistently hold that statements regarding a company's business model or plans, including any underlying assumptions, are forward-looking. *See, e.g.*, *KLX*, 232 F. Supp. 3d at 1280 (statements that "have a forward looking basis . . . combined with historical or present facts" are protected by safe harbor). All of the challenged forward-looking statements identified on Exhibit A are immunized by the safe harbor because they were accompanied by meaningful cautionary language and/or were made without knowledge that they were false or misleading, and Plaintiffs' claims based on those statements must be dismissed.

### 1.    Citrix's SEC Filings And Earnings Calls Included Robust Risk Disclosures.

Although the AC nowhere acknowledges Citrix's robust risk disclosures, almost all of the challenged forward-looking statements[12] are protected from liability because they were specifically identified as forward-looking statements and accompanied by meaningful cautionary language. In particular, when Citrix provided guidance for Q1 and Q2 2021, it included robust risk disclosures identifying the risks that could cause Citrix's actual financial performance to differ from its targets, including the precise risks of which Plaintiffs complain. Starting at the beginning

---

[11] AC ¶¶ 76, 78-82, 85-87, 92-96, 98, 101, 104, 106, 108-10, 112-18, 121-39, 141, 143, 145-47, 149-52, 154-64, 166-75, 178, 183, 185-87, 189-92, 194-98; Challenged Statements Chart, Ex. A (listing, for convenience, the reasons argued herein that each challenged statement is inactionable).

[12] AC ¶¶ 76, 78-81, 85-87, 92-96, 98, 101, 106, 108-10, 112-18, 124-39, 141, 152, 154-64, 166-68, 178, 183, 185-87, 189-92, 194-98; Challenged Statements Chart, Ex. A.

of the alleged Class Period, Citrix identified as forward-looking, among others:

> statements regarding the pace of our transformation, . . . statements regarding our opportunity and product position, . . . statements regarding our near and longer-term growth potential and our multi-year strategy, . . . statements regarding our ability to increase the average duration of customer contracts, statements contained in the Guidance sections and under the Non-GAAP Financial Measures Reconciliation section, including statements concerning fiscal quarters and years ending in 2020, headwind to 2020 revenue, our subscription model-transition, mix of cloud subscriptions and investments, and the impact of the transition on operating margin, and statements regarding ARR, product introductions and management's plans, objectives and strategies.

Q4 2019 Letter, Ex. E, at 13; *see also* Disclosures Chart, Ex. B. Citrix continued to revise this list of forward-looking statements in light of changing circumstances. For example, Citrix added that statements regarding "our short-term license program and our intentions regarding such program, the impacts of the COVID-19 pandemic and related economic conditions on our business and results of operations," among others, were forward-looking. Q1 2020 Letter, Ex. I, at 15; *see also* Disclosures Chart, Ex. B. Because all of the challenged forward-looking statements that were specifically identified as such were also accompanied by meaningful cautionary language, they are immunized from liability. 15 U.S.C. § 78u-5(c)(1)(A)(i).

Meaningful cautionary language is language that "tells the reader in detail what kinds of misfortunes could befall the company and what the effect could be." *Harris*, 182 F.3d at 807. But the safe harbor does not require meaningful cautionary language to identify *all* risk factors or even *the* risk factor that was realized: "when an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Id.*

Starting with the first challenged statements in the Class Period, Citrix included robust risk disclosures in each of its SEC filings and earnings calls that identified the specific risks Plaintiffs allege occurred. *See supra* at 6-7; *see also* Disclosures Chart, Ex. B. And Citrix continued to revise

its meaningful cautionary language in light of changing circumstances. *See supra* at 6-7 ("risks and uncertainties that could cause actual results to differ materially" include Citrix's "short-term license program, promotional programs and product mix, all of which may impact Citrix's revenue recognition"); *see also* Disclosures Chart, Ex. B. Because Citrix disclosed the specific risks that Plaintiffs complain occurred, its forward-looking statements, specifically identified as such, are immunized from liability. *See KLX*, 232 F. Supp. 3d at 1280 (safe harbor immunized forward-looking statements because risk disclosures warned of "the precise risks that came to pass").

In particular, Citrix disclosed the exact risks of which Plaintiffs complain when it provided forward-looking guidance for Q1 and Q2 2021.[13] When Citrix informed investors in the Q4 2020 Letter that it expected Q1 2021 revenue would be between $785 million and $795 million and that GAAP diluted EPS would be between $0.87 and $0.93, it identified the risks that could cause actual results to differ materially, including "risks related to the expansion of cloud-delivered services, Citrix's ability to advance [its] transition from on-premises to the cloud and effectiveness of Citrix's transition and trade-up effort; Citrix's ability to forecast future financial performance during its business model transition." Q4 2020 Letter, Ex. W, at 13, 17-18. The Q4 2020 Letter also incorporated the risk disclosures from Citrix's 2019 Form 10-K, which included almost an entire page of risk disclosures regarding Citrix's transition from on-premises to cloud offerings and specifically disclosed that "market acceptance of [Citrix's cloud] offerings is affected by a variety of factors, including but not limited to: . . . current license terms [and] customer preference." 2019 Form 10-K, Ex. H, at 12. Those are the exact risks that Plaintiffs allege occurred later. *See* AC ¶¶ 179 ("[T]he Company blamed the weak results on . . . duration of on-premises

---

[13] Because Citrix was only began converting Business Continuity Licenses to long-term cloud subscriptions in Q1 2021, statements regarding conversions were necessarily forward-looking. *See* AC ¶ 161 ("*So a lot of those conversation are just starting right now.*" (emphasis in original)).

term licenses that did not extend to the degree . . . expected." (emphasis omitted)), 180 (revenue recognition "was impacted considerably by lower than anticipated on-premises term average contract duration . . . related to conversions of business-continuity use-cases" (emphasis omitted)).

Similarly, when Citrix informed investors in the Q1 2021 Letter that it expected Q2 2021 revenue would be between $840 million and $850 million, it again identified the risks that could cause actual results to differ materially. Q1 2021 Letter, Ex. CC, at 10, 14-15. Those risks included "risks related to the expansion of cloud-delivered services, Citrix's ability to advance [its] transition from on-premises to the cloud and effectiveness of Citrix's transition and trade-up effort; Citrix's ability to forecast future financial performance during its business model transition; . . . changes in bookings mix; reliance on indirect distribution channels and major distributors; [and] failure to successfully partner with key distributors, resellers, systems integrators, service providers and strategic and technology partners." *Id.* at 14-15. The Q1 2021 Letter also incorporated the risk disclosures from Citrix's 2020 Form 10-K, which explicitly disclosed:

> To address the challenges in transitioning our customers to the cloud, we continue to invest in innovation and feature development, simplified cloud migration, and performance and reliability, as well as other cloud customer success and sales initiatives. . . . *If we are unable to transition our customers to cloud-based solutions at the pace we expect, we may experience a negative impact on our overall financial performance.*

2020 Form 10-K, Ex. Y, at 13. It also disclosed that Citrix "rel[ies] significantly on independent distributors and resellers to market and distribute [its] solutions and services" and that changes to its "sales incentive programs for . . . independent distributors and resellers . . . may adversely impact [its] results of operations." *Id.* at 21. It further disclosed that Citrix was investing "significant resources to develop these channel relationships, which could adversely impact [its] results of operations if such channels do not result in increased revenues." *Id.* Again, those are the exact risks that Plaintiffs complain occurred. *See* AC ¶¶ 203, 205 ("Citrix's recent performance was primarily the result of . . . (a) unexpected sales process complexity . . . creating bookings mix

uncertainty; (b) Citrix [being] behind its capacity plan for direct quota carriers, limiting capacity; and (c) [lack of] focus in driving transactional volume through the channel.").

> **2.     The AC Does Not Allege That Any Forward-Looking Statements Were Made With Actual Knowledge That They Were False Or Misleading.**

All of the challenged forward-looking statements are immunized from liability under the second prong of the safe harbor because they were not made with actual knowledge that they were false or misleading. For the same reasons that Plaintiffs failed to allege scienter, they have failed to allege that any of the challenged forward-looking statements were made with actual knowledge that they were false or misleading. *See supra* at 8-17; *see also KLX*, 232 F. Supp. 3d at 1281 (no actual knowledge where "Amended Complaint contain[ed] no relevant allegations—no reports (generated when or by whom), no conversations, no tips, no emails, no confidential witnesses—that indicate or even suggest that Defendants made any statements knowing them to be false").

> **B.     The Challenged Statements Of Opinion Are Inactionable.**

Many of the challenged statements are inactionable for the separate and independent reason that they are statements of opinion.[14] Statements of opinion, *i.e.*, belief or expectation, are actionable only if the speaker "didn't actually believe them" or if the statements of opinion "contained embedded false statements of fact." *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1323 (11th Cir. 2019). To allege an actionable statement of opinion, Plaintiffs must do more than merely allege that Defendants "perhaps *could or should* have known" that their statements of opinion were false or misleading; they must "allege facts with particularity that give rise to a strong inference that the defendants didn't truly believe what they asserted in the statements in question or that the statements embedded false facts." *Id.* Plaintiffs do not even attempt to allege that any of statements

---

[14] AC ¶¶ 76, 78-79, 81-82, 85-87, 93-96, 98, 101, 104, 106, 108-10, 112-18, 121-24, 126-31, 133-39, 141, 143, 145-47, 149-52, 154-57, 159-60, 162-64, 166-74, 178, 183, 185-87, 189-92, 194-98; Challenged Statements Chart, Ex. A.

were not actually believed by the speaker, and for the same reasons that Plaintiffs failed to allege

scienter as to any Defendant, they have failed to allege that any of the Defendants knew that they

embedded false facts. *See supra* at 8-17.

### C.   The AC Does Not Allege That Any Challenged Statements Of Fact Were Materially False Or Misleading At The Time They Were Made.

Similarly, many of the challenged statements are inactionable because they were mere

puffery.[15] "Excessively vague, generalized, and optimistic comments—the sorts of statements that

constitute puffery—aren't those that a 'reasonable investor,' exercising due care, would view as

moving the investment-decision needle—that is, they're not material." *Carvelli*, 934 F.3d at 1320.

Statements that a company is "devoting 'substantial resources' to its problems, with 'improved

results'" or that it is "taking a 'leading role' and making 'progress' toward compliance" are

"quintessential puffery." *Id.* Likewise, statements that a company employs "'rigorous' processes

to ensure the 'efficient' and 'accurate' handling" of its business are inactionable puffery. *DJSP*,

572 F. App'x at 716. Because those statements are all "generalized, vague, nonquantifiable

statements of corporate optimism" on which a reasonable investor could not rely, they are

immaterial and, therefore, inactionable. *Carvelli*, 934 F.3d at 1318.

To the extent Plaintiffs challenge any statements of historical fact, they have failed to allege

that those statements were materially false or misleading.[16] Under Rule 9(b), Plaintiffs must state

---

[15] AC ¶¶ 76, 78-79, 82, 85-87, 91-92, 94, 96, 98, 106-08, 110, 112-14, 116-17, 122-24, 126, 129-31, 133-39, 143, 145-52, 154-55, 158-64, 166-68, 170-75, 182-87, 189, 191-92, 195, 197-98; Challenged Statements Chart, Ex. A.

[16] AC ¶¶ 76-77, 88, 90-91, 94, 97, 100, 102-03, 106-07, 112, 117, 119, 125-26, 130, 138, 140-41, 146-48, 153, 157-59, 161, 165, 178-79, 180-82, 184-89, 193; Challenged Statements Chart, Ex. A. (Plaintiffs do not even attempt to allege why any of the statements alleged in paragraphs 203 through 222 were false or misleading.) To the extent that any challenged forward-looking statements or statements of opinion include any severable and/or embedded statements of historical fact, Plaintiffs fail to allege those severable and/or embedded statements of historical fact were materially false or misleading for the same reasons.

with particularity "the contents of the statements or omissions and how they were misleading." *Id.*

"[T]he disclosure of accurate historical data does not become misleading even if less favorable results might be predicted by the company in the future." *River Birch Capital, LLC v. Jack Cooper Holdings, Corp.*, 2019 WL 1099943, at *4 (S.D.N.Y. Mar. 8, 2019). Because Plaintiffs allege that Citrix made false or misleading statements regarding its business model transformation and financial performance, Plaintiffs must allege how Citrix's statements regarding the progress of that transition and its financial performance differed from the "true" progress of that transition and its financial performance, including what that "true" progress and financial performance was and how Citrix's statements were misleading. *See Cole*, 2009 WL 2713178, at *5. Plaintiffs do not. The AC does not allege that any of the historical factual information regarding Citrix's business model transformation—including Subscription ARR and SaaS ARR—was false, and to the extent Plaintiffs allege that those statements were misleading in light of what they did not disclose, those allegations fail for the reasons *infra* at 25-29.

### D.    Defendants Had No Duty To Disclose The Allegedly Omitted Information.

"Silence, absent a duty to disclose, is not misleading under Rule 10b-5." *In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1274 (11th Cir. 2016). "A duty of disclosure only arises when an omitted fact was necessary to render a preexisting statement not misleading, or because securities law otherwise requires its disclosure." *KLX*, 232 F. Supp. 3d at 1276. The only duties to disclose Plaintiffs even attempt to allege are (1) a duty to make other statements not misleading (*see* AC ¶¶ 270-71), and (2) a duty to disclose "material trends, events, and uncertainties" under Item 303 and "significant factors that made investment [sic] in Citrix risky" under Item 105 of Regulation SK (*id*. at ¶¶ 229-33). Neither provides a basis for liability.

#### 1.    Defendants Had No Duty To Disparage Citrix's Business Model Transformation.

"[A] company has no duty to disparage its own competitive position in the market where

it has provided accurate hard data from which analysts and investors can draw their own conclusions about the company's conditions and the value of its stock." *Rayonier*, 2019 WL 1429667, at *19. Yet that is what Plaintiffs argue Citrix should have done here. *See* AC ¶¶ 89, 105, 120, 142, 176, 199. Every quarter during the Class Period, Citrix disclosed precise data regarding the progress of its business model transition including the exact amount of Subscription ARR and SaaS ARR for that quarter and the exact year-over-year change in Subscription ARR and SaaS ARR. *See, e.g.*, Exs. E, I, M, Q, W, CC, FF. From that "hard data," investors could draw their own conclusions regarding whether to purchase Citrix common stock.

Dismissal of an omissions claim is warranted where, as here, "the information that the plaintiffs contend was omitted does not rest upon specific facts, but only upon generalized opinions." *DJSP*, 572 F. App'x at 717. The information that Plaintiffs allege was omitted rests exclusively on "generalized opinions" and not on any specific facts. *See* AC ¶¶ 89, 105, 120, 142, 176, 199. Moreover, in every instance, Citrix disclosed the allegedly omitted information:

- Plaintiffs allege that "Citrix's customers were focused on continuity rather than . . . transition[ing] to the cloud," and that this was "amplified by the fact that Citrix's cloud product did not significantly augment user capabilities." *Id.* ¶ 230(a). But Citrix disclosed that "business resiliency and continuity are incredibly important to our customers, *many of those customers are continuing buying what they've deployed because it works and it's utilized and engaging for their employee base. . . . [T]hey will get there at their own rate and pace, but it will take them some time.*" *Id.* ¶ 113 (emphasis in original); *see also id.* ¶¶ 104, 126, 167. And Plaintiffs do not allege any facts showing that "Citrix's cloud product did not significantly augment user capabilities." *See id.* ¶ 230(a).

- Plaintiffs allege that "[t]he majority of customers ostensibly transitioning to the cloud only did so because Citrix had extended them cost savings as an incentive, while retaining the ability to operate on premise," and that Citrix "reported revenues from such on-premise customers as cloud subscription revenue." *Id.* ¶ 230(b). But Citrix disclosed that "*[t]he subscription model transition serves as a bridge from legacy on-premises perpetual license and maintenance to the cloud*" (*id.* ¶ 108 (emphasis in original)), and Plaintiffs do not allege any facts showing that a majority of hybrid customers would not transition to the cloud. Plaintiffs also do not allege any facts showing that Citrix reported revenue from on premise subscriptions as SaaS revenue, and they concede that Citrix separately measures subscription and SaaS revenue. *Id.* ¶ 230(b); *see also id.* ¶¶ 106, 125, 153, 181, 185. Revenue from hybrid subscriptions was allocated between SaaS and non-SaaS revenue,

not reported entirely as SaaS revenue. *See supra* at 4-5.

- Plaintiffs allege that "[c]ustomers who entered into . . . Business Continuity Licenses were not poised to shift to new, long-term cloud contracts." AC ¶ 176(c). But Plaintiffs do not allege any facts showing how many customers would not transition to cloud subscriptions, and Citrix disclosed that only some customers would: "*we're in this process this quarter of going through an opportunity to upgrade those customers to – some of them to cloud or to extend them.*" *Id.* ¶ 175 (emphasis in original).

- Plaintiffs allege that Citrix "undertook a pattern of extending existing customer deals rather than entering new arrangements to avoid compensating sales representatives." *Id.* ¶ 230(c). But Citrix disclosed that: "we do have customers that, frankly, are not going to make that move in 2021. And therefore, they do have an option to buy subscription on-premises license, albeit not at the same premium to the seller." *Id.* ¶ 151. Citrix reiterated that message in Q1 2021: "*this year, most of our compensation models are key on helping to migrate our customers from on-prem offering to a cloud subscription. So what we've done is we structured the incentive plan that essentially obviously doesn't compensate people essentially for on-prem offerings.*" *Id.* ¶ 174 (emphasis in original).

- Plaintiffs allege that Citrix's "sales force was also constrained by Citrix's decision to execute the business model transition under a rigid framework that attempted to balance revenue growth, operating margin expansion, and free cash flow growth order to meet management's quarterly expectations." *Id.* ¶ 230(d). But Citrix disclosed that "*we are biased more for growth, but we're doing that within a tight discipline of a business model,*" (*id.* ¶ 23 (emphasis in original)), and provided quarterly guidance regarding its expectations, *see, e.g.*, Q4 2020 Letter, Ex. W, at 13; Q1 2021 Letter, Ex. CC, at 10.

- Plaintiffs allege that Citrix was "dependent on a network of partners to successfully implement its cloud transition" because it "lacked both the sales force necessary to bring the cloud product to market, and the infrastructure necessary to support the installation and deployment of the cloud product." AC ¶ 230(e). But Citrix disclosed that it "rel[ies] significantly on independent distributors and resellers to market and distribute [its] solutions and services." 2020 Form 10-K, Ex. Y, at 21. And Plaintiffs concede that Citrix was able to increase the number of Cloud subscribers by approximately 41% from 7.1 million at the end of 2019 to over 10 million at the end of Q1 2021. *See* AC ¶¶ 77, 195.

- Plaintiffs allege that Citrix "lacked a proper network of partners to assist with the cloud transition [because it] had switched away from its prior channel incentive program." *Id.* ¶ 230(f). But as late February 8, 2021, Citrix disclosed that it was still "in the process of diversifying [its] base of channel relationships [and] . . . building relationships with new types of channel partners." 2020 Form 10-K, Ex. Y, at 21.

- Plaintiffs allege that "Citrix set 2021 sales quotas based on the outsized sales performance of anomalous 2020, creating 2021 quotas that were virtually unachievable and leading to sales representative layoffs in January 2021 and a mass exodus of sales personnel following Citrix's payment to sales representative of a final commissions check for 2020 in February 2021." AC ¶ 230(g). But, again, Citrix disclosed that it was adopting an "*incentive plan*

27

*that . . . doesn't compensate people essentially for on-prem offerings.*" *Id.* ¶ 173.

Because Plaintiffs have not alleged with particularity any facts showing how any of the challenged

statements differed from the purported "truth," they have failed to plead any actionable omissions.

*See Cole*, 2009 WL 2713178, at *7 (no omissions where company "made ongoing disclosures

regarding the problem" and noted that "it might need to adjust these reserves again").

> ### 2.    Defendants Had No Duty To Disclose The Allegedly Omitted Information Under Items 303 Or 105.

This Circuit has not recognized a private right of action under Item 303: "no court of which

we are aware has found a private right of action under Item 303, and the rule itself doesn't seem

to contemplate one." *Carvelli*, 934 F.3d at 1330. Because "Item 303 imposes a more sweeping

disclosure obligation than Rule 10b-5, . . . a violation of the former does not *ipso facto* indicate a

violation of the latter. *Id.* at 1331. The same is true of Item 105 (previously Item 503(c))[17]: "the

Eleventh Circuit has never held that either Item [303 or 105] could supply the basis for a Section

11 claim." *In re Greenlane Holdings, Inc. Sec. Litig.*, 511 F. Supp. 3d 1283, 1312 (S.D. Fla. 2021).

In any event, Plaintiffs fail to state a claim based on Item 303. "To a state a claim based on

a failure to comply with Item 303, a plaintiff must allege facts showing defendants *knew* of an

adverse trend, the material impact of that trend, and that the future material impacts are reasonably

likely to occur from the present-day perspective." *City of St. Clair v. Nationstar Mortg. Holdings

Inc.*, 2016 WL 4705718, at *9 (S.D. Fla. June 21, 2016). But Citrix *did* disclose the allegedly

omitted material trends, events, and uncertainties (*see supra* at 26-28), and for this reason alone,

Plaintiffs fail to state a claim based on Item 303. In addition, for the same reason Plaintiffs do not

allege scienter as to any Defendants (*see supra* at 8-17), they do not allege any Defendants had

actual knowledge of any undisclosed material trends, events, or uncertainties, and any claim based

---

[17] *See* FAST Act Modernization and Simplification of Regulation S-K, 84 Fed. Reg. 12764, 12688-
89 (Apr. 2, 2019).

on Item 303 must be dismissed for this reason as well. *See Nationstar*, 2016 WL 4705718, at \*9.

Plaintiffs also fail to state a claim based on Item 105. Indeed, the AC fails entirely to identify *any* risk factors that were not disclosed. AC ¶ 232-33. Even assuming Plaintiffs meant the same "adverse trends" in paragraph 230 of the AC, they have failed to state a claim based on Item 105. To state a claim based on Item 105, a plaintiff must allege that defendants actually knew that a risk factor existed and that the risk factor could adversely affect the issuer's present or future business. *See Silverstrand Invs. v. AMAG Pharm., Inc.*, 707 F.3d 95, 103 (1st Cir. 2013). Again, Citrix *did* disclose the allegedly omitted risk factors (*see supra* at 26-28; *see also* Disclosures Chart), and for this reason alone, Plaintiffs fail to state a claim based on Item 105. In addition, because Plaintiffs do not allege scienter as to any Defendants (*see supra* at 8-17), Plaintiffs do not allege any Defendants had actual knowledge of any undisclosed risk factors, and any claim based on Item 105 must be dismissed for this reason as well. *See Nationstar*, 2016 WL 4705718, at \*10.[18]

## III.    THE AC DOES NOT ALLEGE LOSS CAUSATION AS TO THE FINAL CORRECTIVE DISCLOSURE.

Plaintiffs allege that "the truth was exposed" through three corrective disclosures on April 29, 2021, July 29, 2021, and October 6, 2021. AC ¶¶ 5-7. However, the final alleged corrective disclosure on October 6, 2021, did not reveal any allegedly undisclosed information to investors— only that Calderoni had succeeded Henshall as Citrix's Interim President and CEO, that Henshall and Gopal had stepped down from Citrix's Board, and that Citrix was postponing its financial analyst meeting. *Id.* at ¶ 255. Because neither the disclosure of the postponed analyst meeting nor

---

[18] Plaintiffs only attribute one misstatement to Hough (AC ¶ 143) and two misstatements to Schmitz (*id.* at ¶¶ 150-51). Because Plaintiffs do not claim that Hough or Schmitz made or disseminated any of the other alleged misstatements in the AC, any claims based on those alleged misstatements should be dismissed against them. *See Lorenzo v. SEC*, 139 S. Ct. 1094, 1103 (2019) (no liability under Rule 10b-5 "where an individual neither *makes* nor *disseminates* false information [and is not alleged to have been] involved in some other form of fraud").

the resignations have anything to do with any of the challenged statements or omissions, Plaintiffs may not recover any damages based on the alleged decline in Citrix's stock price over the following two day period. *See Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 336, 353 (S.D.N.Y. 2015) ("plaintiffs may not seek damages arising from the June 27 Telegraph article" because it did not "reveal any new truth about the alleged fraud").

To plead a corrective disclosure, Plaintiffs must allege that the disclosure "reveal[ed] to the market a pertinent truth." *Bankrate*, 2015 WL 11438106, at *9. An officer's resignation is not a corrective disclosure unless it reveals to the market that previous statements were false or fraudulent. *Id.*; *accord DoubleLine Capital LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 458 (S.D.N.Y. 2018) (announcement of resignation of president and CEO did not support loss causation because "resignation by itself sa[id] nothing" regarding the alleged misstatements). Likewise, the announcement that a planned event will be delayed does not, without more, constitute a corrective disclosure. *See Janbay v. Canadian Solar, Inc*., 2012 WL 1080306, at *15 (S.D.N.Y. Mar. 30, 2012) ("The announcement of a delay in the reporting of [company's] 1Q 2010 financials does not establish loss causation because it fails to reveal the truth that [the company] had engaged in sham sales, secret consignments, or any wrongdoing asserted in the Complaint."). Because Plaintiffs fail to allege any connection between the October 6, 2021, announcement and the challenged statements and omissions, they cannot recover any damages based on the subsequent decline in Citrix's stock price. *See Strougo*, 105 F. Supp. 3d at 336.

## CONCLUSION

For the foregoing reasons, the AC should be dismissed in its entirety with prejudice. *Carvelli v. Ocwen Fin. Corp*., 2018 WL 4941110, at *8 (S.D. Fla. Apr. 30, 2018), *aff'd*, 934 F.3d 1307 (11th Cir. 2019) (dismissing complaint with prejudice because of incurable infirmities).

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b)(2), Defendants respectfully request oral argument on their Motion to Dismiss the Amended Complaint. Defendants respectfully submit that oral argument would assist the Court because of the unique pleading requirements imposed by the PSLRA and the nature of Plaintiffs' allegations.  Defendants estimate that one hour would be sufficient for oral argument.

Dated:  May 7, 2022

**TRENAM, KEMKER, SCHARF, BARKIN, FRYE, O'NEILL & MULLIS, P.A.**

/s/ Amy L. Drushal
Amy Drushal
Florida Bar Number 546895
101 Kennedy Blvd., Ste 2700
Tampa, FL 33602
Tel: (813) 223-7474
Fax: (813) 229-6553
adrushal@trenam.com/lbehr@trenam.com

and

**GOODWIN PROCTER LLP**

*/s/ Deborah S. Birnbach*
Deborah S. Birnbach (*pro hac vice*)
100 Northern Avenue
Boston, MA 02210
Tel: (617) 570-1000
Fax: (617) 523-1231
dbirnbach@goodwinlaw.com

Charles A. Brown (*pro hac vice*)
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Tel: (212) 813-8800
Fax: (212) 355-3333
cbrown@goodwinlaw.com

*Counsel for Defendants*

31

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 27th day of May, 2022, I electronically filed the foregoing with the Clerk of Court by using the Court's CM/ECF system, which will furnish a copy to all counsel of record.

/s/ Amy L. Drushal
Attorney