UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

Case No. 21-62380-Civ-SINGHAL

| | | |
|---|---|---|
| CITY OF HOLLYWOOD POLICE OFFICERS' RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated, | ) ) ) ) ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| CITRIX SYSTEMS, INC., et al., | ) ) | |
| Defendants. | ) ) ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
<u>MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ................................................................................................1

II.     FACTUAL BACKGROUND .............................................................................3

III.    ARGUMENT .......................................................................................................7

        A.      Plaintiffs Properly Plead Falsity ...........................................................8

                1.      Defendants Had a Duty to Disclose the Material Omitted
                        Information ..................................................................................9

                2.      Defendants Cannot Hide Behind a Truth-on-the-Market Defense ............11

                3.      The Misstatements and Omissions Were Material ...................13

                4.      The Safe Harbor Affords No Protection Here ..........................16

        B.      Plaintiffs' Allegations Give Rise to a Strong Inference of Scienter .....................19

                1.      The Significance of Citrix's Transition ....................................20

                2.      Defendants' Positions and Access to Information ....................20

                3.      Defendants' Belated Disclosures and Post-Class Period Events ..............23

                4.      Executive and Director Departures and Reorganization ..........................23

                5.      The Magnitude of Citrix's Earnings Misses .............................25

                6.      Signed SOX Certifications .......................................................26

                7.      Defendants' Financial Motivation ...........................................26

                8.      Corporate Scienter ...................................................................28

        C.      The Complaint Adequately Alleges Loss Causation ............................29

        D.      The Complaint Pleads Control Person Liability Under §20(a)..............................30

IV.     CONCLUSION...................................................................................................30

# TABLE OF AUTHORITIES

**Page**

## CASES

*Abrams v. MiMedx Grp., Inc.*,
   37 F. Supp. 3d 1271 (N.D. Ga. 2014) ......................................................................27

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
   568 U.S. 455 (2013).................................................................................................13

*Bellocco v. Curd*,
   2005 WL 2675022 (M.D. Fla. Oct. 20, 2005) ...............................................11, 12

*Bryant v. Avado Brands, Inc.*,
   187 F.3d 1271 (11th Cir. 1999) ...............................................................................7

*Carvelli v. Ocwen Fin. Corp.*,
   934 F.3d 1307 (11th Cir. 2019) .............................................................................16

*City Pension Fund for Firefighters & Police Officers in City of Miami Beach v. Aracruz Cellulose S.A.*,
   41 F. Supp. 3d 1369 (S.D. Fla. 2011) ..............................................................24, 29

*Croker v. Carrier Access Corp.*,
   2006 WL 2035366 (D. Colo. July 18, 2006) .....................................................2, 26

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005).................................................................................................29

*Epstein v. World Acceptance Corp.*,
   203 F. Supp. 3d 655 (D.S.C. 2016).........................................................................29

*FindWhat Inv'r Grp. v. FindWhat.com*,
   658 F.3d 1282 (11th Cir. 2011) ..................................................................... *passim*

*Frayman v. Douglas Elliman Realty, LLC*,
   515 F. Supp. 3d 1262 (S.D. Fla. 2021) .................................................................8, 29

*Friedman v. Hammer*,
   2020 WL 2559549 (S.D. Fla. May 20, 2020) .........................................................18

*Ganino v. Citizens Utils. Co.*,
   228 F.3d 154 (2d Cir. 2000).....................................................................................11

**Page**

*Garfield v. NDC Health Corp.*,
466 F.3d 1255 (11th Cir. 2006) .............................................................8, 9, 26

*In re BellSouth Corp. Sec. Litig.*,
355 F. Supp. 2d 1350 (N.D. Ga. 2005) ...........................................................14

*In re Clarus Corp. Sec. Litig.*,
201 F. Supp. 2d 1244 (N.D. Ga. 2002) ...........................................................20

*In re Eagle Bldg. Techs., Inc. Sec. Litig.*,
319 F. Supp. 2d 1318 (S.D. Fla. 2004) ...........................................................25

*In re Ebix, Inc. Sec. Litig.*,
898 F. Supp. 2d 1325 (N.D. Ga. 2012) ......................................................12, 22

*In re Equifax, Inc. Sec. Litig.*,
357 F. Supp. 3d 1189 (N.D. Ga. 2019) ...........................................................24

*In re Flowers Foods, Inc. Sec. Litig.*,
2018 WL 1558558 (M.D. Ga. Mar. 23, 2018) ...........................................17, 18, 20

*In re Freidman's, Inc. Sec. Litig.*,
385 F. Supp. 2d 1345 (N.D. Ga. 2005) ...........................................................22

*In re Genworth Fin. Inc. Sec. Litig.*,
103 F. Supp. 3d 759 (E.D. Va. 2015) .............................................................27

*In re GoHealth, Inc. Sec. Litig.*,
2022 WL 1016389 (N.D. Ill. Apr. 5, 2022) ...............................................9, 13, 17

*In re HD Supply Holdings, Inc. Sec. Litig.*,
341 F. Supp. 3d 1342 (N.D. Ga. 2018) ......................................................17, 28

*In re Home Loan Servicing Sols., Ltd. Sec. Litig.*,
2016 WL 10592320 (S.D. Fla. June 6, 2016) ....................................................24

*In re Immucor Inc. Sec. Litig.*,
2006 WL 3000133 (N.D. Ga. Oct. 4, 2006) ................................................20, 28

*In re Med/Waste, Inc., Sec. Litig.*,
2000 WL 34241099 (S.D. Fla. Aug. 30, 2000) .............................................21, 23

**Page**

*In re PainCare Holdings Sec. Litig.*,
    541 F. Supp. 2d 1283 (M.D. Fla. 2007)..................................................................19, 26

*In re Premiere Techs. Inc. Sec. Litig.*,
    2000 WL 33231639 (N.D. Ga. Dec. 8, 2000).........................................................17

*In re Salix Pharm., Ltd.*,
    2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016).........................................................18

*In re Sci.-Atlanta, Inc. Sec. Litig.*,
    239 F. Supp. 2d 1351 (N.D. Ga. 2002), *aff'd sub nom. Phillips v. Sci.-Atlanta, Inc.*,
    374 F.3d 1015 (11th Cir. 2004) ...........................................................................14

*In re Smith Gardner Sec. Litig.*,
    214 F. Supp. 2d 1291 (S.D. Fla. 2002) .................................................................21

*In re Sunterra Corp. Sec. Litig.*,
    199 F. Supp. 2d 1308 (M.D. Fla. 2002) ...............................................................30

*In re Unicapital Corp. Sec. Litig.*,
    149 F. Supp. 2d 1353 (S.D. Fla. 2001) .................................................................12

*Inst. Inv'rs Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009).................................................................................22

*Keippel v. Health Ins. Innovations, Inc.*,
    2019 WL 5698329 (M.D. Fla. Nov. 4, 2019) .......................................................14

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ...............................................................................23

*Luczak v. Nat'l Beverage Corp.*,
    812 F. App'x 915 (11th Cir. 2020) ................................................................13, 19

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)................................................................................8, 9, 13, 14

*MAZ Partners LP v. First Choice Healthcare Sols., Inc.*,
    2020 WL 1072582 (M.D. Fla. Feb. 14, 2020) ................................................12, 26

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013) ...........................................................................29

**Page**

*Mizzaro v. Home Depot, Inc.*,
    544 F.3d 1230 (11th Cir. 2008) ................................................................19, 30

*Mogensen v. Body Cent. Corp.*,
    15 F. Supp. 3d 1191 (M.D. Fla. 2014) ...................................................21, 28

*Monroe Cnty. Emps. Ret. Sys. v. Southern Co.*,
    333 F. Supp. 3d 1315 (N.D. Ga. 2018) ..................................................19, 21

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015) ................................................................................15, 16

*Owl Creek I, L.P. v. Ocwen Fin. Corp.*,
    2018 WL 4844019 (S.D. Fla. Oct. 4, 2018) ...................................................23

*Plumbers & Pipefitters Nat'l. Pension Fund v. Davis*,
    2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020) ...............................................15

*Primavera Inv'rs v. Liquidmetal Techs., Inc.*,
    403 F. Supp. 2d 1151 (M.D. Fla. 2005) ...........................................19, 20, 22

*Pub. Emps. Ret. Sys. of Miss. v. Mohawk Indus., Inc.*,
    564 F. Supp. 3d 1272 (N.D. Ga. 2021) .........................................20, 25, 29

*Rosky ex rel. Wellcare Health Plans, Inc. v. Farha*,
    2009 WL 3853592 (M.D. Fla. Mar. 30, 2009) ..............................................27

*SEC v. Merch. Capital, LLC*,
    483 F.3d 747 (11th Cir. 2007) ...............................................................17, 18

*SEC v. Revolutions Med. Corp.*,
    2015 WL 11199068 (N.D. Ga. Apr. 3, 2015) ...............................................17

*Sheet Metal Workers Local 19 Pension Fund v. ProAssurance Corp.*,
    2021 WL 5866731 (N.D. Ala. Dec. 10, 2021) ..............................................28

*Sood v. Catalyst Pharm. Partners, Inc.*,
    2014 WL 1245271 (S.D. Fla. Mar. 26, 2014) ...............................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) .........................................................................7, 19, 26, 27

**Page**

*Tung v. Dycom Indus., Inc.*,
    454 F. Supp. 3d 1244 (S.D. Fla. 2020) ...............................................................13, 29

*Waterford Twp. Gen. Emps. Ret. Sys. v. BankUnited Fin. Corp.*,
    2010 WL 1332574 (S.D. Fla. Mar. 30, 2010)...............................................27, 28

*Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*,
    426 F. Supp. 3d 864 (D. Kan. 2019)........................................................... *passim*

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78j(b).............................................................................................8, 11, 30
    §78t(a) ..............................................................................................30
    §78u-5(c)(2)(B)(ii)..............................................................................18

Federal Rules of Civil Procedure
    Rule 9(b) ............................................................................................8
    Rule 12(b)(6)......................................................................................7
    Rule 15(a)(2).......................................................................................30

17 C.F.R.
    §240.10b-5(c)...................................................................................... 28

Lead Plaintiff Mineworkers' Pension Scheme and British Coal Staff Superannuation Scheme and plaintiff National Elevator Industry Pension Fund (collectively, "Plaintiffs"), submit this memorandum of law in opposition to Defendants'[1] motion to dismiss (ECF 68, or "Mem.") Plaintiffs' Complaint for Violations of the Federal Securities Laws ("Complaint") (ECF 62).

## I.    INTRODUCTION

This securities fraud class action seeks damages resulting from Defendants' false or misleading statements and omissions during the January 22, 2020 to October 6, 2021 Class Period regarding Citrix's transition away from its historical business practices.  Citrix is a software company that provides digital workspace offerings to companies and organizations.  ¶21.[2]  At a time when Citrix should have been thriving due to the shift from in-person to remote work and Citrix's much-touted transition from selling perpetual software licenses for use by its customers "on-premise" to selling "cloud" based subscriptions (the "Transition"), it was quietly and slowly imploding.  *See, e.g.*, ¶¶29, 32-35, 36-41.

Investors knew Citrix was making a critical transition in its entire business model.  What investors did not know – but Defendants did – was that the Transition was beset by a host of undisclosed problems, including "confusing . . . mixed messaging and priorities" within Citrix's

---

[1]    Defendants are Citrix Systems, Inc. ("Citrix" or "Company") and five individuals: (i) David Henshall ("Henshall"), Citrix's President and CEO from July 2017 until October 1, 2021; (ii) Robert M. Calderoni ("Calderoni"), Citrix's interim CEO and President since October 4, 2021, Citrix's Chairman of the Board of Directors ("Board") since January 2019 and a member of the Board since 2014; (iii) Arlen Shenkman ("Shenkman"), Citrix's CFO and Executive Vice President since September 2019; (iv) PJ Hough ("Hough"), Citrix's Chief Product Officer ("CPO") from July 2017 until November 15, 2021, and EVP from November 2018 until November 15, 2021; and (v) Mark Schmitz ("Schmitz"), Citrix's Chief Operating Officer ("COO") and EVP since August 2019.

[2]    Citations to "¶__" refer to paragraphs of the Complaint.  Unless otherwise noted, internal quotations and citations are omitted, and emphasis is added, from authority cited in this brief.

overly complex sales organization; weakened relationships with critical selling partners; an inability to timely transfer customers to the cloud; and a "lack[ of] focus."  ¶¶6, 210-211, 247.  At all times, as Defendants would later admit, Citrix needed "immediate actions" and "significant changes" to its "sales organization, processes, and [its] go-to-market priorities."   ¶206.  Defendants, however, knew making those changes would cause "short-term disruption before yielding tangible results," and therefore hid or recklessly disregarded the Transition's glaring deficiencies through numerous false or misleading statements.  *See* ¶¶6-7, 68, 207, 254.

At the start of the Class Period, Defendants assured investors the Transition was "coming ***ahead*** of the accelerated plan."  ¶42.  Defendants hid Citrix's problems during the COVID-19 pandemic by selling heavily-discounted, short-term, on-premise "Business Continuity Licenses" ("BCLs").  ¶43.  Defendants assured investors the BCLs were a "great opportunity" because Citrix would rapidly phase them out and convert the customers to subscription-based, cloud customers. ¶44.  Even following the end of BCL sales, Citrix touted that a "large portion" of its new business had transitioned to subscriptions, but failed to tell investors they were on-premise subscriptions sold at steep discounts to customers who would accept mere ***access*** to the cloud (while still retaining an on-premise platform).  ¶¶45-47.  During the Class Period, Defendants misleadingly described the Transition's execution as "obviously on track," supported by strong partner relationships, and stated there was "no lack of [customer] interest" in the cloud and that Citrix had incentivized its "maniacally focused" sales force to "sell cloud" to "make sure that throughout all of Citrix, we're very much focused" on the Transition.  ¶¶87, 104, 116, 163, 166, 171.

Defendants' false statements had their intended effect, with Citrix stock peaking at $173.53 per share on July 22, 2020.  ¶249.  The truth, however, was revealed through three disclosures. *First*, on April 29, 2021, Citrix announced poor first quarter 2021 ("1Q21") financial results and

cut second quarter 2021 ("2Q21") guidance due to Citrix's inability to convert BCL customers to the cloud or roll them over into longer term deals.  ¶¶5, 65,178-198.  Citrix stock fell 10%, but remained artificially inflated as Defendants assured investors the "important takeaway" was that Citrix's problems were limited and "not an ongoing phenomenon."  ¶¶66-67, 191, 200.  *Second*, on July 29, 2021, Defendants revealed extensive problems with the Transition, poor 2Q21 financial results, and admitted Citrix's operations needed immediate and "significant changes" to execute the Transition successfully.  ¶¶68, 203-208.  These disclosures caused Citrix stock to drop 13%, with analysts criticizing Citrix for its "less-than-clear explanation."  ¶¶68, 217.  *Third*, on October 6, 2021, Citrix revealed Henshall had stepped down as CEO and President several days earlier, that Henshall and another board member resigned, and that Citrix was postponing an analyst meeting.  ¶¶70, 218.  This final disclosure caused Citrix stock to drop more than 7%.  ¶¶71, 219.

Despite all this, Defendants argue the Complaint fails to plead: (1) any actionable misstatements; (2) scienter, and; (3) loss causation as to *only* the October 6, 2021 disclosure.  Mem. 29-30.  Defendants are wrong.  Considered in totality, the Complaint adequately alleges that Defendants, with scienter, made numerous materially false or misleading statements and omitted material facts they had a duty to disclose, which, once revealed, negatively impacted Citrix's stock price.  Defendants' Motion should be denied.

## II.    FACTUAL BACKGROUND

Leading up to the Class Period, Citrix's flagship software product, Citrix Workspace, was sold to a diverse array of multi-sized businesses through an internal sales team and a heavily-relied-upon network of external partners.  ¶¶21-25.  Operating in a highly-competitive industry against heavyweights like Microsoft, Amazon Web Services, and VMWare, Citrix historically sold its products through "perpetual" software licenses, which gave customers lifetime access and

support in exchange for full payment upfront.  ¶¶26-27.  Citrix's long-time business model also saw Citrix deliver its products through "on-premise" data centers owned and operated by its customers.  ¶28.

Citrix, however, needed to adapt to the permanent, industry-wide shift from perpetual, on-premise software sales to subscription-based, cloud offerings hosted on servers maintained by third-parties and accessed by customers over the internet.  ¶¶29-30.  With this fundamental transition, Citrix switched to annual billing, with revenues recognized ratably over the contract term.  ¶30.  By 2019, Citrix faced stiff competition from cloud computing providers and worked to develop key partnerships with public-cloud providers and other technology providers.  ¶¶31-32.

Prior to the Class Period, Defendants assured investors Citrix was ready and able to make the crucial Transition.  ¶33 (Henshall stated he had "slowly been evolving [Citrix's] leadership team to really focus on where the [C]ompany has been going"); ¶34 (Shenkman assured investors he knew how to execute a cloud transition); ¶35 (Hough touted his experience helping Microsoft with its "transition of on-prem business to sort of cloud and SaaS and subscription" and how Citrix was "on that same journey").  The Transition, however, was plagued with myriad undisclosed problems, including Citrix's decision to let customers purchase discounted hybrid license agreements, which were nothing more than on-premise licenses with the *possibility* of transitioning to the cloud.  ¶¶38, 46.  In exchange for agreeing to an ostensible cloud solution at some point in the future, Citrix no longer charged customers for maintenance (but still provided it) and instead billed them on a subscription basis.  *Id*.  Rather than transfer to the cloud, Citrix's customers extended their contracts to remain on-premise.  ¶¶39, 47.  Despite this, Citrix reported revenues from the extended contracts as cloud subscription revenues.  ¶¶39, 46-47.

Several other undisclosed problems afflicted the Transition.  The cloud product not only

came with a sprawling number of SKUs and licensing models that made it significantly harder for customers to do business with Citrix, but it did not sufficiently offer user capabilities beyond those available on-premise. ¶48. Citrix also lacked a viable program to implement cloud solutions and lacked the sales capacity necessary to sell enough cloud software to meet the accelerated Transition timeline. ¶¶40, 49. Because Citrix lacked enough personnel to handle the Transition, it depended on striking deals with partners, but Citrix also lacked the partner ecosystem necessary to do so, and the attempt to push deals through partners created significant friction with Citrix's own sales force, because it became "increasingly difficult to make money on Citrix deals." ¶¶41, 49-51. This dynamic caused significant issues within Citrix in early 2020, as Citrix backed away from assurances to its partners while account managers refused to work with Citrix's partners. ¶41. Others damaged the partner ecosystem by selling products to customers directly – instead of selling through partners. *Id*. ("Citrix vice presidents questioned why the Company relied on partners, alienating partners who learned of these issues, and also attempted to cut partners out of deals, only to be rebuffed by customers who refused to do so."). On top of that, Citrix switched away from a channel incentive program that gave its partners full margins upfront on deals to a rebate program where roughly half of the margin came on the back end. ¶50. Relationships with partners got progressively worse in early 2021 as the Company, faced with a slowdown in the pace of the Transition, eliminated the back end payments. *Id*.

Defendants masked the slow pace of the Transition and its problems by capitalizing on the pandemic shift to remote work through the sale of short-term, on-premise BCLs at steep discounts. ¶43. Although BCLs provided a temporary revenue boost, they clashed with the Transition plan, and Defendants assured investors the BCLs would be rapidly phased out, would provide long-term benefits, and created an expectation that Citrix would sign BCL customers to multi-year

agreements and transition them into the cloud.   ¶¶44, 56.  But when Citrix offered renewals to BCL customers at roughly three times what they originally paid, the customers either fled to competitors or transitioned to another short-term, on-premise subscription.  ¶56.

The slow Transition caused another problem – Citrix's internal sales quotas became unattainable.  ¶57.  Citrix set its 2021 sales quotas above 2020 targets, rendering them unrealistic because they were based on the one-time, pandemic-fueled 2020 BCL sales.  *Id*.  As the Transition struggled, Citrix terminated a number of sales representatives in early 2021 and others left in a mass exodus around February 2021.  *Id*.  The rampant turnover left Citrix relying on an inexperienced sales force, further hurting Citrix's cloud transition.  ¶58.

Despite countless issues, of which the Individual Defendants were keenly aware given that the Transition was Citrix's "top priority," they had direct involvement with and monitored the Transition's pace and "detailed metrics," and discussed the Transition on every Class Period conference call and earnings letter, Defendants assured investors Citrix had the "heightened level of coordination and alignment across the organization" to successfully adapt.  ¶¶59-62 (Defendants had "detailed metrics" on Citrix's Salesforce.com application and a database that tracked sales and customer transitions "granularly.").  Meanwhile, the Individual Defendants personally benefitted, selling more than $24 million of their personally held shares during the Class Period.  ¶63.

Defendants could not keep Citrix's problems under wraps forever.  The Transition's problems were revealed to the market in a series of three partial disclosures.  ¶64.  *First*, before the market opened on April 29, 2021, Defendants reported Citrix badly missed on EPS and revenue for 1Q21, cut the Company's 2Q21 and full year 2021 guidance, and revealed, contrary to their previous statements, that Citrix had lower-than-expected conversions of BCLs to long-term contracts.  ¶65.  Instead, customers "rolled into another short-term" on-premise license.  *Id*.  These

disclosures caused a 10% decline in the price of Citrix stock. ¶66. Defendants, however, continued to mislead investors, emphasizing that the 1Q21 numbers would "mark the trough" and that "headwinds" had turned to be "tailwinds" for the immediate future. ¶67.

*Second*, before the market opened on July 29, 2021, Defendants conceded Citrix was suffering from the Transition and needed to "evolve [its] sales strategy to deliver more predictable results." ¶68. Defendants admitted Citrix could not accurately forecast its business and that it needed a "significant" restructuring that would cause "short-term disruption before yielding tangible results." *Id*. Contrary to being beyond the "trough," Citrix's 2Q21 results missed on the top line, its full year 2021 profit forecast was slashed, and investors learned Citrix's cash flow from operations would "be lower in 2021 as compared to 2020." *Id*. This shocked the market and sent Citrix shares tumbling by more than 14%, closing at $99 per share on July 29, 2021. ¶69.

The third and final disclosure came on October 6, 2021, when Citrix revealed Henshall had abruptly stepped down as CEO and President two days earlier, that both Henshall and Dr. Ajei Gopal ("Dr. Gopal") stepped down from Citrix's Board, and that Citrix canceled a scheduled meeting with securities analysts, causing Citrix stock to fall by more than 7%. ¶¶70-71.

## III.    ARGUMENT

In reviewing Defendants' Motion under Rule 12(b)(6), the Court must consider the Complaint in its entirety, "accept all factual allegations . . . as true," and construe all reasonable inferences in Plaintiffs' favor.[3] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 309-10, 322 (2007). The Complaint amply pleads each of the six elements required to establish a

---

[3]    Defendants append over 700 pages of exhibits to their Motion, including charts made by counsel and Forms 4. ECF 69-70. Any argument by Defendants to have such documents accepted for their "truth" should be rejected. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 n.15 (11th Cir. 1999) (SEC documents should not be noticed to "prove the truth of [their] contents.").

violation of Section 10(b) and Rule 10b-5.[4]  Defendants primarily challenge only falsity and scienter, and only contest loss causation as to the October 6, 2021 disclosure.  As such, Defendants have waived any further challenges to the remaining elements, or the April 29, 2021 and July 29, 2021 loss causation events, and are prohibited from raising them, or any other new challenges, on reply.  *Frayman v. Douglas Elliman Realty, LLC*, 515 F. Supp. 3d 1262, 1279 n.5 (S.D. Fla. 2021) (arguments not raised in motion to dismiss cannot be raised on reply).

### A.     Plaintiffs Properly Plead Falsity

Rule 10b-5 prohibits false statements or omissions of material fact necessary to make statements, in the light of the circumstances under which they were made, not misleading. *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011).  Under the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 9(b), a complaint pleads falsity if it specifies "the who, what, when[,] where, and how" of a defendant's statements. *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006).

The Complaint satisfies these requirements by detailing how critical the Transition was to Citrix (¶¶29-35) and how Defendants gave the false impression that the Transition was successful and that Citrix was capable of executing it (¶¶33-35) while concealing myriad problems, including: weakened relationships with Citrix's partners (¶¶40-41, 50, 211 ("we just haven't done enough . . . to really enable our traditional channel partners to participate" in the Transition)); Citrix's inability to rapidly transfer large numbers of customers to the cloud without the help of those same

---

[4]   To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant [falsity]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).

embattled partners (¶¶40, 51), significant complications within Citrix that limited sales of its cloud platform (¶¶205-212), and the failure to convert customers from BCLs to Citrix's cloud platform (¶¶43-45, 56, 179-180, 188).  The Complaint details the time, place, speaker, and content of each alleged misstatement and omission (¶¶76-88, 90-104,106-119, 121-141, 143-175, 179-198) and explains in detail why each statement was materially false and misleading (¶¶89, 105, 120, 142, 176, 199).  Nothing more is required.  *Garfield*, 466 F.3d at 1262; *In re GoHealth, Inc. Sec. Litig.*, 2022 WL 1016389, at *6 (N.D. Ill. Apr. 5, 2022) (statements regarding company's business transition and its financial impacts were actionable); *Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*, 426 F. Supp. 3d 864, 870-73 (D. Kan. 2019) (same).

### 1.    Defendants Had a Duty to Disclose the Material Omitted Information

Defendants incorrectly argue they had no duty to disclose omitted facts.  Mem. at 25-29. By repeatedly speaking in detail about the critical Transition, Defendants had a duty to fully disclose material facts related to the Transition in order to make their statements not misleading. *Matrixx*, 563 U.S. at 44; *FindWhat*, 658 F.3d at 1299, 1305 ("[E]ven absent a duty to speak, a party who discloses material facts . . . assumes a duty to speak fully and truthfully.").  Defendants failed to do so, and instead concealed material facts from investors.

For example, Defendants misleadingly described the execution of the Transition as successful (¶147), "obviously on track" (¶116) or "ahead of the accelerated plan" (¶79), supported by strong channel and partner relationships (¶¶87, 166), and that Citrix's business was "financially extremely strong throughout" the Transition (¶82), and that "[n]othing ha[d] changed from [Citrix's] longer-term strategic path" (¶135).  Likewise, Defendants claimed there was "no lack of [customer] interest" in the cloud, that accelerated conversions were occurring as expected and with "increased traction," and that Citrix would convert a "good portion" of BCLs to cloud-based SaaS

contracts.  ¶¶104, 112, 133-134, 145, 155, 170, 173.   Describing the Transition as "really successful," Henshall stated Citrix's "installed base" moved "aggressively" to the cloud (¶158), adding that Citrix had incentivized its sales force to "sell cloud" to "make sure that throughout all of Citrix, we're very much focused on customer success, active use, migrating customers to cloud, et cetera" (¶163).   Henshall also stated Citrix's sales force was "maniacally focused on where we're going, but also cleanly aligned in terms of these outcomes."  ¶171.

These positive statements gave rise to speak fully and truthfully, which Defendants failed to do.  For example, Defendants did not disclose that Citrix, at all times, needed "[s]ignificant changes," including in its "sales organization, processes, and [its] go-to-market priorities" and that Citrix's Transition was hampered by a host of internal Company problems, including too much "complexity," and "mixed messaging and priorities" that Henshall later admitted were "confusing," "just frankly inefficient," and "causing execution as well as forecasting inaccuracies."  ¶¶206-207, 210-212, 214.   Even after the truth began to leak out, Defendants doubled-down on their misstatements.   On April 29, 2021, for example, Henshall extolled "momentum in the business, especially around [Citrix's] cloud adoption and the migration of [Citrix's] installed base," claimed the Transition was "progressing well" as reflected in "all of our ARR metrics, which have continued to accelerate," and stated that Citrix was "on track to ahead of" its plan accelerate the Transition.  ¶¶186, 191, 195.   Defendants also downplayed the Company's disappointing 1Q21 financial results, stating that they would "mark the trough" and that Transition "headwinds" would become "tailwinds" in the immediate future.  ¶¶183, 186, 191. Further, Henshall assured investors that Citrix's inability to convert BCLs to long-term contracts was "a very isolated item" and "not a broader-scope issue whatsoever."  ¶¶194, 197.   The half-truths and omissions identified in the Complaint make clear Defendants breached their duty to

disclose.  *See CURO*, 426 F. Supp. 3d at 871-72 (omissions actionable where plaintiffs identified various statements concerning company's business transition and performance, specific facts that should have been disclosed, and how the statements were misleading in light of the omissions).

### 2.     Defendants Cannot Hide Behind a Truth-on-the-Market Defense

Defendants advance an improper "truth-on-the-market" defense, arguing the omissions were disclosed by Defendants during the Class Period.  Mem. at 26-28.  A truth-on-the market defense is "rarely . . . appropriate" for "dismissing a § 10(b) complaint." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000).  Defendants must prove the truth was conveyed with sufficient "intensity" to counteract misleading information.  *Id.*  Defendants fail to meet this high burden because none of their disclosures sufficiently addressed or cured the specific misstatements or material omissions, and their false reassurances prevented investors from learning the truth.  *See* §§V-VI; *FindWhat*, 658 F.3d at 1305 (defendants "may not deal in half-truths"); *Bellocco v. Curd*, 2005 WL 2675022, at *2 (M.D. Fla. Oct. 20, 2005) (disclosures "in conjunction with Defendants' corporate optimism" do not put the market on "actual notice of fraud").

For example, Defendants argue they disclosed that: customers were transitioning "at their own rate and pace, but it will take them some time"; "[t]he subscription model transition serves as a bridge from legacy on-premises perpetual license and maintenance to the cloud"; and BCL customers could upgrade to the cloud or extend.  Mem. at 26.  These statements, however, failed to reveal any of the Transition problems detailed in the Complaint.  *See, e.g.*, ¶¶48-51, 230; *see also* §§III.A.1, *supra*.  Nor did they alert investors that Citrix needed "several significant and immediate actions" to address "key challenges" that included reorganizing Citrix's entire sales team, which was hamstrung by confusion, "complexity," and "mixed messaging and priorities." ¶¶206-212.  Rather than being laser focused on the Transition, Citrix was a rudderless ship

- 11 -

floundering in the seas of change. *See CURO*, 426 F. Supp. 3d at 870 (omissions made statements actionable where allegations were "not merely based on predictions or projections of financial performance that proved inaccurate" but "that defendants failed to disclose specific facts, particularly concerning the strategy and timing of the transition").

Likewise, statements that Citrix "rel[ied] significantly on independent distributors and resellers to market and distribute [its] solutions and services" and was "in the process of diversifying [its] base of channel relationships [and] . . . building relationships with new types of channel partners" (Mem. at 27) did not reveal the particular problems with Citrix's channel partners, who moved to Citrix's competitors when Citrix eliminated its channel incentive program and back end payments, which in turn hindered the Company's sales and installation capacity necessary to meet its accelerated transition timeline. ¶¶49-51. None of the disclosures cited by Defendants fully cured the misstatements or omissions alleged, which involved then-occurring problems concealed by Defendants. *FindWhat*, 658 F.3d at 1305; *Bellocco*, 2005 WL 2675022, at *2; *In re Unicapital Corp. Sec. Litig.*, 149 F. Supp. 2d 1353, 1373 (S.D. Fla. 2001) (truth-on-the-market defense inapplicable where adverse impact of publicly known fact was undisclosed). Similarly, Henshall and Shenkman's certifications, asserting Citrix's SEC filings contained no materially false statements or omissions, while failing to disclose material information required by the Sarbanes-Oxley Act of 2002 ("SOX"), were also false. ¶¶88-89, 100, 117, 138, 165; *MAZ Partners LP v. First Choice Healthcare Sols., Inc*., 2020 WL 1072582, at *4-5 (M.D. Fla. Feb. 14, 2020).[5]

---

[5] Defendants did not disclose material information required by Items 105 and 303 of SEC Regulation S-K. ¶¶227-233. Defendants' argument that they disclosed omitted material trends, events, uncertainties, and risks in compliance with Item 105 and 303 (Mem. at 28-29) should be rejected for the reasons discussed above. *See In re Ebix, Inc. Sec. Litig.*, 898 F. Supp. 2d 1325,

That Defendants were not obligated to "disparage [Citrix's] own competitive position" (Mem. at 25-26) misses the mark. To be sure, Defendants were under no such obligation. But, they also were not permitted to hide known execution problems that not only hampered the Transition, but left Citrix unable to accurately forecast its business – while they simultaneously highlighted positive information about the same subject. *FindWhat*, 658 F.3d at 1305.

### 3.  The Misstatements and Omissions Were Material

The misstatements and omissions alleged in the Complaint were material. Materiality is satisfied when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx*, 563 U.S. at 38. Materiality is an objective, fact-specific determination rarely appropriate for resolution on a motion to dismiss. *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 467 (2013). Instead, materiality is typically "resolved by the factfinder." *Luczak v. Nat'l Beverage Corp.*, 812 F. App'x 915, 924 (11th Cir. 2020) (*per curiam*).

Defendants' misstatements and omissions were material because they concerned Defendants' specific actions and verifiable metrics regarding a strategic shift in Citrix's business model, affecting every aspect of its operations and finances. *See, e.g.*, ¶¶29-35, 33, 61 (Henshall emphasizing the Transition was Citrix's "focus" and a "big strategic transformation[]"); *Luczak*, 812 F. App'x at 925 (statements citing "specific strategies and metrics" are not puffery); *Tung v. Dycom Indus., Inc.*, 454 F. Supp. 3d 1244, 1257 (S.D. Fla. 2020) (statements regarding tangible, verifiable actions the defendant said it was taking "such as: establishing relationships with leading [] providers and increasingly providing integrated planning, engineering and design," were not

1333, 1343-44 (N.D. Ga. 2012) (material omissions under Rule 10b-5 supported by violations of Item 303); *GoHealth*, 2022 WL 1016389, at *6 (same); *CURO*, 426 F. Supp. 3d at 872 (same).

puffery).  The fact that Defendants continually emphasized and highlighted the Transition every quarter during the Class Period further demonstrates that it was material and not puffery.  ¶61; *see Keippel v. Health Ins. Innovations, Inc.*, 2019 WL 5698329, at \*7 (M.D. Fla. Nov. 4, 2019) (when executives stress that a particular topic is important to success, those statements are not puffery).

Materiality is further supported by the 10.58%, 13.57%, and 7.21% stock price declines (¶¶66, 69, 71, 200-201, 215, 219) and analysts' reactions to the corrective disclosures, including: UBS questioning "the value proposition of transitioning to cloud-hosted Workspace," and noting that "pressures have been building at Citrix for a year now; this didn't stem from a 2Q specific execution issue"; Morningstar criticizing the "less-than-clear explanation of the sales execution issue"; and Jefferies expressing concern over the "potential magnitude of the reset and the lack of visibility."  ¶¶202, 216-217, 221-222; *In re BellSouth Corp. Sec. Litig.*, 355 F. Supp. 2d 1350, 1371 (N.D. Ga. 2005) (disclosure's effect on stock price supports materiality); *In re Sci.-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1361 n.6 (N.D. Ga. 2002) (an "analyst's comparison" supports materiality), *aff'd sub nom. Phillips v. Sci.-Atlanta, Inc.*, 374 F.3d 1015 (11th Cir. 2004).[6]

Defendants next argue that certain facts regarding the Transition, including certain cloud subscription metrics,[7] were accurate.  Mem. at 25.  This argument contradicts the Complaint, which must be taken as true, that the metrics were misleading because they included customers who ostensibly had access to the cloud but were not using it.  *See, e.g.*, ¶47 (Defendants "book[ed] revenues from" on-premise contracts as "subscription revenues."); *see also* ¶¶38-39, 46.  Further,

---

[6]    Defendants' portrayal of certain misstatements as "puffery," based on truncated quotes (Mem. at 24-25), contradicts the fact-based, contextual review of materiality mandated by the Supreme Court and should be rejected.  *Matrixx*, 563 U.S. at 38.

[7]    *See* ¶¶90, 105(b), 106, 118-119, 120(b), 122, 125, 127, 130, 141, 142(b), 147, 153, 155, 157-158, 167, 169, 175, 176(b), 181-182, 185-186, 196, 199(b).

even a literally true statement can be misleading when viewed in context.  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 187-90 (2015).  As discussed above, when Defendants conveyed positive information concerning the Transition, they were obligated to disclose underlying problems that made the positive information misleading.  *See* §III.A.1, *supra*; *FindWhat*, 658 F.3d at 1299, 130; *Plumbers & Pipefitters Nat'l. Pension Fund v. Davis*, 2020 WL 1877821, at *9 (S.D.N.Y. Apr. 14, 2020) (where defendants "cited their strategy as a source of their success," they have "to tell the whole truth" regarding "short-run sales tactics").  Defendants failed to do so.  ¶¶76-88, 90-104,106-119, 121-141, 143-175, 179-198.[8]

Separately, Defendants' statements are not inactionable opinions.  Mem. at 23-24.  *First*, Plaintiffs allege factual statements, not opinions, about present and historical matters, including the "acceleration of" the Transition (¶80); "The acceleration of our year-over-year SaaS ARR growth rate" (¶155); and cloud adoption "traction with our customers" (¶173) which involved actual problems surrounding Citrix's Transition during the Class Period.  *See* §§V-VI (detailing alleged misstatements of then-present and historical fact related to the Transition and the financial benefits to Defendants).  *Second*, even if opinions, Defendants' statements are still actionable regardless of whether they were "not actually believed" (Mem. at 24) by Defendants – because Plaintiffs identified omissions of material fact that "conflict with what a reasonable investor . . . would take from the statement itself."  *Omnicare*, 575 U.S. at 189.

Here, Defendants conveyed to investors that Citrix's Transition was experiencing strong

---

[8]   Defendants contend that even if alleged statements regarding the Transition were statements of historical fact they are still inactionable because the Complaint failed to explain how they were misleading.  Mem. at 24-25.  This argument fails because the Complaint provides exacting detail on the reasons why each alleged statement was misleading.  ¶¶89, 105, 120, 142, 176, 199; §III.A, *supra*.

momentum in its cloud transition and poised to reap financial gains as a result.  §§V-VI.  The Complaint alleges that the "real facts" concerning the Transition were "otherwise, but not provided" (*Omnicare*, 575 U.S. at 188) – that the cloud transition was beset by myriad problems including among other things a failure to convert purchasers of BCLs to the cloud – and therefore Defendants' alleged misstatements were actionable even if opinions.  §IV-C; ¶¶89, 105, 120, 142, 176, 199.

### 4.      The Safe Harbor Affords No Protection Here

The statutory safe harbor, which only protects forward-looking statements accompanied by meaningful cautionary language (Mem. at 18-23), is inapplicable here for four reasons.  *First*, the safe harbor does not apply to misstatements of historical or current fact.  *FindWhat*, 658 F.3d at 1298-99.  This includes, for example, the alleged statements about the current status of the Transition and specific financial effects on the Company as a result.  §§V-VI; §III.A.1, *supra* (examples of alleged statements of historical or current fact).  Defendants' portrayal of such statements as forward-looking "projections" while ignoring their plain language (Mem. at 18-19, n. 11) is off the mark.[9]  *See, e.g.*, ¶82 ("[o]ur businesses **continue to be** financially extremely strong throughout the [T]ransition"); (¶191) ("The business model **is** transitioning nicely.  You **see** the success across all of our ARR metrics, **which have continued to** accelerate.").

*Second*, the safe harbor does not apply to Defendants' multiple omissions of material fact, which cannot be forward-looking, and, therefore, do not qualify for safe harbor protection.  *See*

---

[9]    Defendants erroneously claim that in the Eleventh Circuit, "[p]resent-tense statements with forward-looking connotations are considered forward looking" Mem. at 18.  Not so.  In *Carvelli v. Ocwen Fin. Corp.*, repeatedly cited by Defendants, the court made clear that a present tense statement "appended to a forward-looking clause" may only be protected if it is "an inextricable part, rather than an easily severed ancillary, of a forward-looking statement."  934 F.3d 1307, 1328-29 (11th Cir. 2019).

§III.A.1, *supra* (discussing Defendants' material omissions); *SEC v. Revolutions Med. Corp.*, 2015 WL 11199068, at *4 (N.D. Ga. Apr. 3, 2015) (an "actionable omission . . . cannot be sanitized by forward-looking statements"); *In re Premiere Techs. Inc. Sec. Litig.*, 2000 WL 33231639, at *17 (N.D. Ga. Dec. 8, 2000) ("Statements and omissions of past and current circumstances cannot be cured by reference to future difficulties and undetected problems.").

*Third*, Defendants' cautionary language was insufficient.  The adequacy of cautionary language "is a fact-intensive inquiry" better resolved "after discovery."  *In re HD Supply Holdings, Inc. Sec. Litig.*, 341 F. Supp. 3d 1342, 1359 (N.D. Ga. 2018).  The warnings must have been "specifically tailored . . . to the risks Plaintiff argues existed."  *In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 1558558, at *11 (M.D. Ga. Mar. 23, 2018).  "[T]o caution that it is only possible for . . . unfavorable events to happen when they have already occurred is deceit."  *SEC v. Merch. Capital, LLC*, 483 F.3d 747, 769 (11th Cir. 2007).

Here, Defendants' purported cautionary language and disclosures (Mem. at 19-23) were not specifically tailored, instead referring to generic factors applicable to any software company, rather than Citrix's business at that time.  *See, e.g.*, Mem. at 20-22 (citing warnings including "our opportunity and product position"; "our near and longer-term growth potential and our multi-year strategy"; "our ability to increase the average duration of customer contracts"; "current license terms [and] customer preference"; Citrix's "reli[ance] significantly on independent distributors and resellers to market and distribute [its] solutions and services"; and Citrix's investment of "significant resources to develop these channel relationships, which could adversely impact [its] result of operations if such channels do not result in increased revenues"); *FindWhat*, 658 F.3d at 1299 ("general warnings about risks" were not "specifically tailored"); *GoHealth*, 2022 WL 1016389, at *5 (generic risk warnings about a strategic business change were insufficient).  The

insufficiency of such general language is supported by the fact that Citrix repeated it in multiple Class Period filings without providing meaningful updates as business conditions worsened, such as increasingly diminished cloud sales caused by Citrix's rampant problems.[10]  *See Flowers*, 2018 WL 1558558, at *11 (cautionary language was insufficiently tailored where it was repeated in company's "10-Ks . . . despite the new information [it] received").[11]

Moreover, all of the purported cautionary language and risk disclosures cited by Defendants regarding the Transition (Mem. at 20-22) were insufficient – and false and misleading in themselves – because the "risks" warned of had already materialized.  For example, Citrix warned that "market acceptance of [Citrix's cloud] offerings is affected by. . . current license terms [and] customer preference" (Mem. at 21) and "[i]f we are unable to transition our customers to cloud-based solutions at the pace we expect, we may experience a negative impact on our overall financial performance" (Mem. at 22).  But, the Company's Transition problems were ***already occurring*** during the Class Period, including customers being unwilling to move from Citrix's legacy on-premise product to its lackluster cloud product, when the purported warnings were made.  *See also* §IV.C (detailing further Transition problems).  As the Eleventh Circuit has recognized, cautionary language does not cure misleading statements where the "unfavorable events had already occurred."  *Merch. Capital*, 483 F.3d at 769; *see also Friedman v. Hammer*,

---

[10]   Mem. at 19-22; Ex. E at 17-18; Ex. H at 3, 11-12, 20; Ex. I at 19-20; Ex. M at 18-19; Ex. Q at 20-21; Ex. W at 21-22; Ex. Y at 3, 13-14, 21; Ex. CC at 18-19; Ex. FF at 19-20.

[11]   The safe harbor also does not apply to Defendants' oral statements on conference calls (¶¶79-82, 94-98, 104, 111-116, 121-123, 129-137, 143, 145-151, 158-164, 169-175, 186-198), because "[t]he cautionary statements included at the beginning of each conference call were brief and generic" and failed to identify even a "single important factor that could lead to different results." *In re Salix Pharm., Ltd.*, 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016); 15 U.S.C. §78u-5(c)(2)(B)(ii) (requiring an "accompanying oral statement" to identify "the document, or portion thereof, that contains the additional information about those factors relating to the forward-looking statement").

2020 WL 2559549, at *3 (S.D. Fla. May 20, 2020) (risk warning inadequate where alleged fraud was based on defendant's then-current state of affairs).

*Fourth*, Defendants' contention that the purported "forward-looking" statements are inactionable because they were not made with actual knowledge of falsity (Mem. at 23) fails for the same reasons discussed below, in the context of Defendants' scienter.  *See* §III.B, *infra*; *Primavera Inv'rs v. Liquidmetal Techs., Inc*., 403 F. Supp. 2d 1151, 1157 (M.D. Fla. 2005).

### B.      Plaintiffs' Allegations Give Rise to a Strong Inference of Scienter

The Supreme Court instructs that a court must accept Plaintiffs' scienter allegations as true and "assess all the allegations holistically."  *Tellabs*, 551 U.S. at 326.  "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'"  *Id.* at 324.[12]  Scienter "boils down to whether a reasonable person would infer that there was at least a fifty-fifty chance" that defendants knew, or were severely reckless in not knowing, about the alleged fraud.  *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1249 (11th Cir. 2008).  Scienter is a "mixed question" that is "typically [] resolved by the factfinder."  *Luczak*, 812 F. App'x at 924.

As set forth below, this case has numerous indicia of scienter that, when viewed collectively, establish the requisite strong inference.  *See* ¶¶223-226, 234-247.  Nevertheless, Defendants devote the vast majority of their argument to just one of the scienter allegations –

---

[12]  Defendants argue the Complaint is deficient because it lacks "confidential witnesses," or citations to "emails."  Mem. at 3, 9.  Witness accounts are not required to allege scienter.  *See In re PainCare Holdings Sec. Litig*., 541 F. Supp. 2d 1283, 1293 (M.D. Fla. 2007) *adopted by* 541 F. Supp. 2d 1283 (M.D. Fla. 2008) (rejecting argument that lack of witnesses negates scienter); *Monroe Cnty. Emps. Ret. Sys. v. Southern Co*., 333 F. Supp. 3d 1315, 1323 (N.D. Ga. 2018) (rejecting argument that scienter required "specific details of first-hand interactions with a defendant in which they advised him that existing facts contradicted his public disclosures").

insider selling – while providing short shrift to the rest. Mem. at 10-18. Defendants also predictably (and improperly) attack each scienter allegation in isolation (while ignoring others), to assert the Complaint's "boilerplate" allegations fail to raise "any" inference of scienter. Mem. at 3, 9-18. Defendants are wrong, and their motion should be denied.

### 1.    The Significance of Citrix's Transition

Defendants' false statements concerning the critical Transition, which altered Citrix's business model (¶¶2, 29, 61, 85, 101, 117; Mem. at 5), support an inference of each Defendant's scienter. *See Flowers*, 2018 WL 1558558, at *14 (scienter "bolstered" by allegations that fraudulent scheme was "core operation" of company); *In re Immucor Inc. Sec. Litig.*, 2006 WL 3000133, at *18 (N.D. Ga. Oct. 4, 2006) ("[k]nowledge of facts relating to [a company's] core functions [is] imputed to a company's key officers"). The Transition was Defendants' "top priority" (¶59) and Henshall stated it "required a heightened level of coordination and alignment across the organization" and reiterated management's "focus" on it throughout the Class Period. ¶61. Defendants neither dispute nor address the Transition's importance as a factor weighing in favor of their scienter, but given it altered Citrix's entire business model, this factor supports a finding of scienter. *See Pub. Emps. Ret. Sys. of Miss. v. Mohawk Indus., Inc.*, 564 F. Supp. 3d 1272, 1302 (N.D. Ga. 2021) (segment generating 40% of worldwide sales was a "substantial contribution" supporting scienter); *In re Clarus Corp. Sec. Litig.*, 201 F. Supp. 2d 1244, 1251 (N.D. Ga. 2002) (transaction accounting for one-third of quarterly revenue supported scienter).

### 2.    Defendants' Positions and Access to Information

Scienter is further supported by each of the Individual Defendants' controlling positions, access to and review of detailed metrics that demonstrated the falsity of their statements, and their control of the misstatements to the market. *See* ¶¶59, 60, 234-245, 276; *Primavera*, 403 F. Supp.

2d at 1158 (finding defendants' controlling positions, access to internal adverse information about the company, and an opportunity to prevent misleading statements supports scienter); *Monroe Cnty.*, 333 F. Supp. 3d at 1325 (individual defendants' positions, responsibilities, and access to information contributed to an inference of scienter).

The Individual Defendants were Citrix's senior executives and officers.  ¶¶15-20, 234. They accessed internal data regarding the Transition's "problems" through "Citrix's Salesforce.com application" and an internal database that "tracked sales and customer transitions granularly."  ¶¶59-60.  The Complaint provides over twenty examples of Henshall, Shenkman, Hough, and Schmitz admitting to a "focus" on monitoring data on the Transition's "pace" and its impact on Citrix's financial condition through "subscription bookings," billing and invoice "compression," support and services and subscription revenue, and "adoption for new customers." *See* ¶¶59-60, 237.[13]  Such specific data metrics, reviewed and discussed throughout the Class Period, would have alerted Defendants to the falsity of their public statements. *Id.*[14]  Finally, the Individual Defendants do not dispute that they each controlled Citrix's public messaging to

---

[13]   In June 2021, the Individual Defendants' compensation changed to become dependent on the success of the Transition via the "SaaS ARR metric" (which measured the recurring revenue of cloud-based agreements).  ¶238.  Defendants improperly attack this allegation "standing alone" and misunderstand its import to scienter.  Mem. at 16.  The point is not that this plan's financial incentives were "extraordinary," but that it ***changed*** each Individual Defendant's incentive plan to depend on a Transition-based metric.  Thus, it is yet another fact supporting the inference that it is more likely than not that Individual Defendants actively monitored the Transition.

[14]   Defendants rely on factually distinguishable cases with less particularized and collective allegations.  *See* Mem. at 15-16.  Beyond asserting scienter based on "senior management positions" with "access to inside information" as in *In re Smith Gardner Sec. Litig.*, 214 F. Supp. 2d 1291 (S.D. Fla. 2002), here the Individual Defendants controlled the content of the misleading statements, and accessed and monitored data demonstrating the falsity of their statements.  Unlike *Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1220 (M.D. Fla. 2014) or *In re Med/Waste, Inc., Sec. Litig.*, 2000 WL 34241099, at *6 (S.D. Fla. Aug. 30, 2000), Plaintiffs allege sufficiently more collective and particular facts than just a "generalized" allegation of an "internal reporting system" and management's "active engagement."

investors on the Transition by either making or receiving the alleged misleading statements before or shortly after they were issued, with an ability to correct them. ¶¶235, 276; §V. Taken together with the totality of the Complaint, these allegations bolster scienter. *See Primavera*, 403 F. Supp. 2d at 1158 (finding scienter based on defendants' roles as President, Chairman of the Board and Directors; receipt of "advanced copies of" public filings, "personally participat[ing] in conference calls to analysts and investors"; and "unfettered access to internal adverse information" with "opportunity to prevent the release of any misleading statement").

The content and context of Defendants' specific statements about the Transition and its impact on Citrix's financial performance further support an inference of scienter. *See Inst. Inv'rs Grp. v. Avaya, Inc*., 564 F.3d 242, 269 (3d Cir. 2009) ("the most powerful evidence of scienter is the content and context of [defendant's] statements themselves"). Throughout the almost two-year Class Period, Defendants spoke frequently about these topics in SEC filings, in press releases, and on public conference calls. *See* §§V-VI, IX.A-B. The Transition was discussed on every conference call and in every earnings letter, and the Individual Defendants provided and reviewed prepared statements and responded to specific analyst questions regarding the pace of the Transition, and its effect on Citrix's financial position. ¶61; §V. The frequency and specificity of these statements supports scienter. *See Ebix*, 898 F. Supp. 2d at 1346-47 ("active participation in press releases, earnings calls, and SEC filings dealing with the issues" and "the nature, duration and extent of the fraud alleged, would lead a reasonable person to conclude" defendant "knew about the fraud or [was] at least severely reckless in not knowing about it"); *In re Freidman's, Inc. Sec. Litig*., 385 F. Supp. 2d 1345, 1362 (N.D. Ga. 2005) (defendants' role as senior official that made misstatements during time of alleged accounting fraud supported scienter).

### 3.      Defendants' Belated Disclosures and Post-Class Period Events

Defendants' belated disclosures contribute to a strong inference of Defendants' scienter. *See Lormand v. US Unwired, Inc*., 565 F.3d 228, 254 (5th Cir. 2009) ("admissions by the individual defendants . . . directly and cogently tend to prove their state-of-mind at the time of their misleading statements and omissions, *i.e.*, they are evidence that the defendants actually knew earlier that the course of action would turn out badly").  In April 2021, Henshall admitted Citrix's sub-par 1Q21 revenue was due to "conversions of [BCLs] from the **year ago** period."  ¶247.  In July 2021, he acknowledged "**we've** [] **had** problems with really managing and accurately forecasting a lot of these new business areas" and "**we started** taking several significant and immediate actions" in response.  *Id*.  In November 2021, Calderoni conceded, "[l]ooking back on **the last few quarters** [] **we** faced execution challenges" requiring a "deep dive into all aspects of the company's operations to determine what actions **we** need to take."  ¶247.  These admissions on behalf of Citrix support an inference of each Defendant's scienter.  *See Owl Creek I, L.P. v. Ocwen Fin. Corp*., 2018 WL 4844019, at *11 (S.D. Fla. Oct. 4, 2018) (defendants' admission that backdating scheme had been going on "for years" was sufficient to infer scienter); *CURO*, 426 F. Supp. 3d at 874 (post-class period admissions regarding failure to accurately explain the "negative impact of [company] transition" supported inference of scienter).[15]  Taken collectively, along with the post-Class Period restructuring (¶¶224-226), the Complaint alleges scienter.

### 4.      Executive and Director Departures and Reorganization

The disruption to Citrix's leadership, which came on the heels of consecutive earnings misses and guidance cuts, and the vague explanation of sales execution issues, contribute to the

---

[15]   Unlike *Med/Waste*, 2000 WL 34241099, at *8 (Mem. at 17), Plaintiffs here allege more than a financial restatement and allege Defendants knew or recklessly disregarded the negative financial impact stemming from the Transition *at the time* of the misstatements.

strong inference of scienter. ¶¶203-218, 221, 224; *In re Equifax, Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1245-46 (N.D. Ga. 2019) (sudden departure of high-ranking executives can be probative of scienter); *In re Home Loan Servicing Sols., Ltd. Sec. Litig.*, 2016 WL 10592320, at \*7 (S.D. Fla. June 6, 2016) (crediting scienter allegation that individual defendant at epicenter of allegations was forced to resign). Defendants ignore this additional indicia of scienter. *See* Mem. at 8-18.

Citrix went through a significant leadership transition and Company-wide shakeup. *First*, Henshall, who had been with the Company since 2006, stepped down as CEO and President on Monday, October 4, 2021, which Citrix did not disclose to investors until after the market closed two days later, on October 6, 2021, when Citrix announced Henshall had been replaced by Calderoni. ¶¶7, 15, 70, 218. The disclosure also revealed that Henshall resigned from the Board five days earlier, on October 1, 2021, that Dr. Gopal resigned from the Board on October 4, 2021, and that Citrix shrank its Board by 20%. ¶¶7, 70, 218, 221. *Second*, Defendants also revealed Citrix needed "[s]ignificant changes," including in its "sales organization, processes, and [its] go-to-market priorities." ¶206. Citrix described these "significant changes" as "several significant and immediate actions" to address "key challenges," including reorganizing the entire sales team and its leadership, which would "cause short-term disruption before yielding tangible results." ¶¶206-207. Henshall made clear the "root cause" was a host of sprawling internal Company problems. ¶¶210-211. Henshall's admissions made clear Citrix's poor performance and inaccurate forecasting were not due to changed circumstances or recent events, but systemic operational shortcomings that left Citrix unable to successfully execute the Transition. *See* ¶212. *Third*, after the Class Period, Citrix announced a significant restructuring and revealed Hough's removal as CPO and EVP. ¶¶223-224. These factors further support an inference of scienter. *City Pension Fund for Firefighters & Police Officers in City of Miami Beach v. Aracruz Cellulose S.A.*,

41 F. Supp. 3d 1369, 1397 (S.D. Fla. 2011) (considering resignations as part of scienter analysis).

### 5. The Magnitude of Citrix's Earnings Misses

"A number of decisions cite the magnitude of the fraud in weighing an alleged inference of scienter." *In re Eagle Bldg. Techs., Inc. Sec. Litig.*, 319 F. Supp. 2d 1318, 1326-28 (S.D. Fla. 2004) ("the more serious **the error**, the less believable are defendants' protests that they knew nothing") (emphasis in original); *Mohawk Indus.*, 564 F. Supp. 3d at 1304 ("The type and amount of fraud alleged here would not be hidden from the CEO . . . of the company"); *Sood v. Catalyst Pharm. Partners, Inc.*, 2014 WL 1245271, at *7 (S.D. Fla. Mar. 26, 2014) (considering the "magnitude" of the misrepresentation in scienter analysis).

The magnitude of Citrix's Transition problems are difficult to overstate, and they first manifested themselves in two financial disclosures. *First*, on April 29, 2021, Citrix not only announced a sizeable drop in its 1Q21 EPS and a 10% drop in revenue, but also announced Citrix's 2Q21 earnings would badly miss projections. ¶¶65-66. It also announced 2021 EPS would be approximately 10% under its original guidance of $6.20 to $6.40 per share – guidance Defendants reiterated only three months earlier and maintained through April 2021. *See* ¶¶153-175. *Second*, when Citrix reported its 2Q21 results, it missed on the top line and reported EPS 40% below consensus estimates, revised down its full year profit forecast, cut EPS estimates again, and revealed cash flow from operations would drop in 2021 compared to 2020. ¶204. The magnitude of these facts, when considered in context and in conjunction with the Complaint's other scienter allegations, supports a strong inference of scienter.[16]

---

[16] Defendants assert one competing scienter inference – that Citrix encountered "unexpected setbacks" – and then make the self-serving argument that it is the "*only* inference that can be drawn." Mem. at 9 (Defendants' emphasis). Their conclusory argument carries no weight and

### 6.      Signed SOX Certifications

Defendants argue Henshall's and Shenkman's false SOX certifications cannot support scienter because Plaintiffs do not allege any "glaring accounting regularities" or "red flags."  Mem. at 15.  But their SOX certifications did more than attest to Citrix's financials, they **also** certified that Citrix's quarterly and annual SEC filings did "not contain **any** untrue statement of a material fact" or any material omissions.  *Compare* ¶88(2) *with* ¶88(3); *see also* ¶236; *MAZ Partners*, 2020 WL 1072582, at *4-5 (finding SOX certifications "can form an actionable basis for a securities fraud claim" and rejecting argument that SOX certifications are only actionable if they pertain to financial results).  By falsely attesting to the accuracy of the 10-K and 10-Qs, the SOX certifications are yet another factor probative of Henshall's and Shenkman's respective scienter.[17]

### 7.      Defendants' Financial Motivation

Although not required, the Complaint's motive allegations add to the strong inference of scienter.  *See Tellabs*, 551 U.S. at 325 ("the absence of a motive allegation is not fatal").  Defendants were motivated to misrepresent and conceal Citrix's true condition to maximize the favorable terms for the March 2021, $2.25 billion Wrike acquisition, which was announced right after Citrix affirmed "2022 targets" (¶¶149, 152) and reported positive 4Q20 and FY20 financial

---

even if Defendants' inference is at least as compelling as any drawn from the facts alleged, the tie goes to the Plaintiffs.  *See Paincare Holdings*, 541 F. Supp. 2d at 1291-92.

[17]   Although *Garfield* evaluated SOX certifications in the context of false financial statements, its holding should not be so broad such that SOX certifications can **never** be indicative of scienter for other types of actionable false statements.  466 F.3d at 1266 (finding SOX certification of financial statements "only probative of scienter" if signer "had reason to know, or should have suspected [misstatements], due to . . . 'red flags'").  If SOX certifications themselves can be false for any type of materially false statements, it stands to reason that they can also be indicative of scienter for any type of materially false statement therein.  *See MAZ Partners*, 2020 WL 1072582, at *7; *see also Croker v. Carrier Access Corp.*, 2006 WL 2035366, at *11 (D. Colo. July 18, 2006) (finding SOX certifications "constitute one factor among many that courts may consider, in the totality of the circumstances, to evaluate scient[e]r").

results and FY21 and 1Q21 guidance (¶¶153-161), and closed a month before the April 29, 2021 disclosure.  ¶168; *see In re Genworth Fin. Inc. Sec. Litig*., 103 F. Supp. 3d 759, 786 (E.D. Va. 2015) (close proximity of debt offering to positive, but false, statements supported inference of scienter); *CURO*, 426 F. Supp. 3d at 875 (company's "$690 million offering" provided motive for defendants not to disclose negative financial information related to important transition).

Next, each of the five Individual Defendants' insider sales, totaling $24 million, further supports scienter.  ¶¶239-246; *see Tellabs*, 551 U.S. at 310 (allegations of "personal financial gain may weigh heavily in favor of a scienter inference").  *First*, Defendants' Class Period sales were suspiciously timed, with the majority (and in certain cases, all) of them occurring prior to the April 29, 2021 disclosure.  *See* ¶¶242-246 (Henshall sold 69%; Calderoni sold 100%; Hough sold 100%; Shenkman sold 50%; and Schmitz sold 100%); *see Abrams v. MiMedx Grp., Inc.*, 37 F. Supp. 3d 1271, 1278 (N.D. Ga. 2014) ("substantial" sales after receipt of FDA inspection report supports scienter); *Rosky ex rel. Wellcare Health Plans, Inc. v. Farha*, 2009 WL 3853592, at *7 (M.D. Fla. Mar. 30, 2009) (insider sales five months prior to federal raid supported scienter).

*Second*, analysis of the Individual Defendants' collective stock sales from the 89 weeks prior to the Class Period to the 89-week Class Period shows the shares sold and total proceeds increased, by 34.5%, and 69%, respectively.  *See* Mem. at Exs. HH-LL.  Henshall's stock sales increased from 73,293 shares in the 89 weeks pre-Class Period to 114,314 during the 89-week Class Period, with proceeds almost doubling from $7.5 million to $14.4 million.  *Id*. at Ex. HH. Likewise, Schmitz's stock sales increased five-fold, from 5,130 to 25,700 shares, with proceeds increasing seven-fold from $555,000 to almost $3.5 million.  *Id*. at Ex. LL.[18]

---

[18]   The court's finding in *Waterford Twp. Gen. Emps. Ret. Sys. v. BankUnited Fin. Corp.*, relied on by Defendants (Mem. at 12), did not analyze whether an inference can be drawn from pre- vs.

Moreover, that many of Henshall's, Hough's, Shenkman's, and Schmitz's trades were made pursuant to a Rule 10b5-1 trading plan adopted during the Class Period (Henshall's on May 20, 2020 and January 22, 2021; Hough's on March 10, 2020; Shenkman's on June 10, 2020; and Schmitz's on July 24, 2020) **and** before the negative news entered the market supports an inference of scienter.[19] *See* Mem. at 11-12 (citing *Mogensen*, 15 F. Supp. 3d at 1222 (acknowledging trading plans are suspicious when adopted during the class period)); *see also Immucor*, 2006 WL 3000133, at *18 n.8 (trading plan may give rise to an inference of scienter because "a clever insider might 'maximize' their gain from knowledge of an impending price drop over an extended amount of time, and seek to disguise their conduct with a 10b5-1 plan.").[20]   Considered collectively, the Individual Defendants' motivations and stock sales support a strong inference of scienter.

### 8.    Corporate Scienter

Defendants only assert the Complaint falls short in alleging scienter as to the Individual Defendants (Mem. at 17-18), but do not dispute that the "knowledge of individuals who exercise substantial control over a corporation's affairs is properly imputable to the corporation."  *Sheet Metal Workers Local 19 Pension Fund v. ProAssurance Corp*., 2021 WL 5866731, at *21 (N.D.

---

[19]   Hough's March 2020 plan was entered into the month prior to Citrix reporting positive 1Q20 results, Henshall's May 2020 plan was entered into the month after Citrix reported positive 1Q20 financial results, Shenkman's June 2020 plan was entered the month before Citrix reported positive 2Q20 results, and Schmitz's the day after.  *See* Mem. at Ex. HH, JJ, KK (applicable Forms 4).

post-class period proceeds, as Defendants suggest.  2010 WL 1332574, at *14 (S.D. Fla. Mar. 30, 2010).  Rather, that case focused on whether, among other things, the defendant's class period sales occurred "prior to the alleged start" of the investigation that "alerted" defendant to the alleged fraud, which is not the case here.  *Id.*

[20]   Despite filing extensive exhibits at the pleadings stage to argue Defendants' sales were made pursuant to trading plans, Defendants fail to mention when the trading plans were entered into. Defendants' "missing details," such as when the plans were entered into, whether they were properly entered into, abided by, or amended, fail to "wholly negate any scienter."  *HD Supply Holdings*, 341 F. Supp. 3d at 1362; 17 C.F.R. §240.10b-5(c).

Ala. Dec. 10, 2021) (imputing scienter of two company division presidents to corporation). Because Plaintiffs plead scienter as to the Individual Defendants, Citrix's scienter is established.

### C.     The Complaint Adequately Alleges Loss Causation

The Complaint adequately alleges loss causation from three corrective disclosures (¶¶248-257), but Defendants contest only the third and, as a result, cannot raise arguments challenging the April 29 or July 29, 2021 disclosures on reply.  Mem. at 29-30; *Frayman*, 515 F. Supp. 3d at 1279 n.5.  "Loss causation is the 'causal connection between the material misrepresentation and the loss [incurred].'"  *Tung*, 454 F. Supp. 3d at 1258 (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005)).  "A plaintiff 'need not rely on a single, complete, corrective disclosure; rather, it is possible to show that the truth gradually leaked out into the marketplace through a series of partial disclosures.'"  *Id.* at 1258-59 (quoting *Meyer v. Greene*, 710 F.3d 1189, 1197 (11th Cir. 2013)).  "Loss causation pleading need only satisfy Rule 8 standards, not the heightened standards of Rule 9 or the PSLRA."  *Mohawk Indus.*, 564 F. Supp. 3d at 1305.  Importantly, "resignation announcements can be corrective disclosures where they are viewed collectively with other disclosures."  *Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 674-76 (D.S.C. 2016); *Aracruz Cellulose*, 41 F. Supp. 3d at 1398 (loss causation tied to CFO resignation).

Nor does the disclosure need to be a mirror image of Defendants' false and misleading statements.  In *Tung*, for example, this Court found the defendants' loss causation arguments "simply untenable" because they argued the plaintiffs did not plead a "***direct connection***" between the financial guidance between the two partial disclosures and the stock drop.  454 F. Supp. 3d at 1259 (emphasis in original).  Defendants employ the same tactic here regarding the October 6, 2021 disclosure, arguing an officer's resignation is not corrective unless it reveals previous statements were false or fraudulent.  Mem. at 29-30.  And like in *Tung*, it should be rejected.

When viewed in context alongside the other corrective disclosures, the delayed announcement that Henshall had already resigned as CEO and President ***days earlier***, that Henshall and Dr. Gopal had already stepped down from the Board ***days earlier***, that Citrix was shrinking its Board by 20%, and that Citrix was not in a position to attend a scheduled analyst meeting, which caused a negative stock price reaction, are sufficient to plead loss causation.  ¶¶218, 255.  This sent a clear signal that the "challenge[s] associated" with the Transition, the need to "evolve" to "deliver more predictable results," and the "problems with really managing and accurately forecasting a lot of these new business areas" extended to Citrix's highest levels and still existed in October 2021.  ¶¶254-255.  Market analysts agreed.  ¶¶221 (analyst stated Henshall's departure was a "negative" that would "likely serve to deepen and lengthen the transition," and observed the "immediate departure of the CEO . . . just 3+ months after Citrix announced an accelerated model transition to cloud/subscription implies some execution challenges").  Thus, the Complaint adequately alleges loss causation as to the October 6, 2021 disclosure.

### D.     The Complaint Pleads Control Person Liability Under §20(a)

Because the Complaint adequately alleges primary violations of §10(b), it also satisfies the §20(a) control person requirement.  ¶¶276-277; *Mizzaro*, 544 F.3d at 1237.

## IV.    CONCLUSION

For the above reasons, the Motion to Dismiss should be denied in its entirety.[21]

---

[21]   If the motion is granted in whole or in part, Plaintiffs respectfully request leave to amend.  Fed. R. Civ. P. 15(a)(2); *In re Sunterra Corp. Sec. Litig*., 199 F. Supp. 2d 1308, 1339 (M.D. Fla. 2002).

DATED:  June 17, 2022                    Respectfully submitted,

                                          ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                          ROBERT J. ROBBINS
                                          FLORIDA BAR NO. 0572233
                                          ANDREW T. REES
                                          FLORIDA BAR NO. 062247

                                          _____
                                                  *s/ Robert J. Robbins*
                                               ROBERT J. ROBBINS

                                          120 East Palmetto Park Road, Suite 500
                                          Boca Raton, FL  33432
                                          Telephone:  561/750-3000
                                          561/750-3364 (fax)
                                          rrobbins@rgrdlaw.com
                                          arees@rgrdlaw.com

                                          ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                          MARK SOLOMON (*pro hac vice*)
                                          DANIEL S. DROSMAN (*pro hac vice*)
                                          RAPHAELLA FRIEDMAN (*pro hac vice*)
                                          655 West Broadway, Suite 1900
                                          San Diego, CA  92101
                                          Telephone:  619/231-1058
                                          619/231-7423 (fax)
                                          marks@rgrdlaw.com
                                          ddrosman@rgrdlaw.com
                                          rfriedman@rgrdlaw.com

                                          *Lead Counsel for Plaintiffs*

                                          O'DONOGHUE & O'DONOGHUE LLP
                                          JOHN M. MCINTIRE
                                          5301 Wisconsin Avenue, N.W., Suite 800
                                          Washington, DC  20015

                                          *Additional Counsel for National Elevator*
                                          *Industry Pension Fund*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on June 17, 2022, I authorized the electronic

filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send

notification of such filing to the e-mail addresses of all counsel of record.

*s/ Robert J. Robbins*
ROBERT J. ROBBINS