UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-62380-CIV-SINGHAL

CITY OF HOLLYWOOD POLICE
OFFICERS' RETIREMENT SYSTEM,
on behalf of itself and all others similarly
situated,

       Plaintiffs,

v.

CITRIX SYSTEMS, INC., DAVID
HENSHALL, ROBERT M. CALDERONI,
ARLEN SHENKMAN, PJ HOUGH, and
MARK SCHMITZ,

       Defendants.
_____/

## OPINION AND ORDER

**THIS CAUSE** is before the Court upon Defendants Citrix Systems, Inc. ("Citrix"), David J. Henshall, Robert M. Calderoni, Arlen Shenkman, PJ Hough, and Mark J. Schmitz' (the "Citrix Officers," and together with Citrix, "Defendants") Motion to Dismiss the Amended Complaint with prejudice, filed on May 27, 2022 (the "Motion") (DE [68]). Lead Plaintiff Mineworkers' Pension Scheme and British Coal Staff Superannuation Scheme and Plaintiff National Elevator Industry Pension Fund (collectively, "Plaintiffs") filed a Response on June 17, 2022 (DE [71]). Defendants filed a Reply on July 1, 2022 (DE [72]). A motion hearing was held on September 29, 2022. The Motion is now ripe for this Court's consideration.

## I.   BACKGROUND

Defendants move to dismiss the Amended Complaint (DE [62]) ("Am. Compl.") with prejudice pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b). Plaintiffs bring the instant

action on behalf of themselves and all Citrix shareholders who purchased shares between January 22, 2020 and October 6, 2021 (the "class period") against Citrix and the five named individual defendants. *See* Am. Compl., at 4–5. Plaintiffs assert violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.15b-5. *See* Am. Compl., at 5. In the Amended Complaint, Plaintiffs allege Defendants misled investors about their efforts to transform Citrix's business model. *Id.* Plaintiffs explain that Citrix historically sold perpetual licenses to customers who received access to Citrix software programs, which they maintained on-premises in their own host computer networks and data centers. *Id.* Plaintiffs assert that, leading up to the class period, the industry began shifting away from traditional on-premises licenses to cloud-based subscription services. *Id.* Facing heavy competition from the likes of Amazon Web Services and VMWare, Plaintiffs explain, Citrix needed to fundamentally transform its business model to offer cloud-based subscription services to remain competitive. *Id.* However, as soon as this transition began, Plaintiffs assert, myriad problems including weakened relationships with sales partners, an inability to rapidly transfer large numbers of customers to the cloud without partner help, complications within the company's sales organization that limited ability to sell the cloud platform, and failure to convert business-continuity license ("BCL") customers to the cloud beset Citrix.[1] *Id.* at 5–6.

Despite these problems, Plaintiffs allege, Defendants repeatedly assured investors the transition was proceeding according to plan. *Id.* Plaintiffs contend that, because of Defendants' false and misleading statements and omissions, Citrix stock traded at inflated

---

[1] BCLs, Plaintiffs explain, were offered to customers at steeply discounted rates in early 2020 in response to the COVID-19 pandemic to enable customers to maintain business operations remotely. *Id.* Plaintiffs contend that Defendants made representations to shareholders that BCL sales would create an opportunity for existing customers to transition to the cloud. *Id.*

prices as high as $173.56 per share and then fell as the truth emerged causing substantial investor losses. *Id.* at 6–7. When financial results were made public for the first quarter of 2021, investors learned Citrix had missed earnings-per-share targets and revenue projections due to the negative impact of limited-use licenses it had sold customers. *Id.* According to Plaintiffs, this caused a stock decline of more than 10% on or around April 30, 2021. *Id.* Nevertheless, Plaintiffs contend, Defendants assured investors that the problems related to limited-use licenses were a "limited-impact item" and "not an ongoing phenomenon." *Id.* Defendants further stated, Plaintiffs explain, that this marked a trough and that there would be improved "top-line" performance in the next quarter as business model transition "headwinds" turned into "tailwinds" due to the transition's momentum. *Id.* On July 29, 2021, when financial results for the second quarter of 2021 were released, however, investors were again alarmed by further problems revealed with the cloud transition, and Citrix stock fell another 13%. *Id.* at 7. And at market closing on October 6, 2021, Plaintiffs add, investors learned that Citrix's CEO and a board member had resigned and that the company had pushed back its financial analyst meeting. *Id.* at 8. This, Plaintiffs contend, caused Citrix stock to drop another 7% over the next few days. *Id.*

## II.   **LEGAL STANDARD**

To state a securities fraud claim based on failure to reveal information to investors under Section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, promulgated thereunder, 17 C.F.R. § 2401.10b–5, a plaintiff must prove "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss,

commonly called 'loss causation.'" *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236–37 (11th Cir. 2008) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)). To "impose[] derivative liability on persons that control primary violators of the Act" under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), a plaintiff must prove (1) the business entity defendant committed a primary violation of the securities laws, (2) the individual defendants could control the general business affairs of the business entity defendant, and (3) the individual defendants had the requisite power to influence the corporate policy that resulted in primary liability. *Mizzaro*, 544 F.3d at 1237 (cleaned up).

"Ordinarily, a complaint is adequate if it meets Fed. R. Civ. P. 8(a)(2)'s requirement of a short and plain statement of the claim showing that the pleader is entitled to relief. But securities fraud claims, like other types of fraud claims, have always been subject to Fed. R. Civ. P. 9(b)'s heightened pleading requirements, which require a complaint to state with particularity the circumstances constituting fraud." *Mizzaro*, 544 F.3d at 1237 (cleaned up). Under Rule 9(b), a plaintiff must allege "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud.'" *ADA v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010) (quoting *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380–81 (11th Cir. 1997)) (cleaned up). "At bottom, the purpose of particularity pleading is to alert defendants to their precise misconduct and protect them against baseless charges of fraudulent behavior." *Drummond v. Zimmerman*, 454 F. Supp. 3d 1210, 1216 (S.D. Fla. 2020) (citations omitted). Notably, "under Rule 9(b), it is sufficient to plead the who, what, when, where, and how of the allegedly false statements

4

and then allege generally that those statements were made with the requisite intent." *Mizzaro*, 554 F.3d at 1237.

In 1995, Congress passed the Private Securities Litigation Reform Act ("PSLRA"), Pub. L. No. 104–67, 109 Stat. 737 (1995), which altered Rule 9(b)'s particularity requirement by requiring that a securities fraud class action complaint (1) specify each allegedly misleading statement and explain why it is misleading, and (2) state the particular facts that give rise to a strong inference that the defendant acted with the required state of mind. *See* 15 U.S.C. §§ 78u–4(b)(1)(B), (b)(2). Stated differently, "[t]he PSLRA requires plaintiffs to state with particularity both [1] the facts constituting the alleged violation, and [2] the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (citations omitted).  Thus, a securities fraud class action plaintiff "can no longer plead the requisite scienter element generally" and "must allege facts supporting a strong inference of scienter for each defendant with respect to each violation." *Mizzaro*, 544 F.3d at 1238 (citing *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1016 (11th Cir. 2004)). And "[t]he mere magnitude of a Complaint alone . . . does not assure that the heightened pleading requirements under the Reform Act have been met." *Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1324–25 (S.D. Fla. 2004). Nevertheless, while the PSLRA changed the pleading standard for scienter, it did not change any substantive intent requirements. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1284 (11th Cir. 1999). Under section 10(b) and Rule 10b–5, a plaintiff must prove "intent to deceive, manipulate, or defraud," or "severe recklessness."[2] *Id.* at 1282. Thus, to survive a motion to dismiss,

---

[2] "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.* at 1282 n.18.

a securities fraud class action plaintiff must plead "with particularity facts giving rise to a strong inference of scienter that [] defendants either intended to defraud investors or were severely reckless when they made the allegedly materially false or incomplete statements." *Mizzaro*, 544 F.3d at 1238.

A "strong inference of scienter" is an inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 310. In making this inquiry, a court must assess "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard . . . ." *Id.* Thus, a court must "consider the complaint in its entirety," and "omissions and ambiguities count against inferring scienter." *Id.* This inquiry is "inherently comparative" because a court "must take into account plausible opposing inferences." *Id.* at 324. "The inference . . . need not be irrefutable, i.e., of the "smoking-gun" genre, or even the "most plausible of competing inferences . . . [but] must be more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations." *Id.* at 310. Thus, ultimately, a court must determine, when the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference. *Id.*

Scienter is a "mixed question[] of law and fact that must typically be resolved by the factfinder." *Luczak v. Nat'l Beverage Corp.*, 812 Fed. App'x. 915, 924 (11th Cir. 2020) (citing *SEC v. Merch. Capital, LLC*, 483 F.3d 747, 766 (11th Cir. 2007)). And individual witness accounts are not required to allege scienter. *In re PainCare Holdings Sec. Litig.*, 541 F. Supp. 2d 1283, 1293 (M.D. Fla. 2007), *adopted by* 541 F. Supp. 2d 1283 (M.D. Fla. 2008) (lack of witness accounts did not negate scienter); *Monroe Cnty. Emps. Ret.*

*Sys. v. Southern Co.*, 333 F. Supp. 3d 1315, 1323 (N.D. Ga. 2018) (scienter did not require "specific details of first-hand interactions with a defendant in which they advised him that existing facts contradicted his public disclosures . . . .").

## III.   __DISCUSSION__

Defendants seek dismissal for failure to plead elements (1), (2), and (6) of a Section 10(b) securities fraud claim. *Supra* section II.; see *Mizzaro*, 544 F.3d at 1236–37. First, Defendants contend the Amended Complaint does not allege facts sufficient to form a strong inference of scienter. *See* Motion, at 14–24. Defendants argue the Amended Complaint fails to allege that Citrix officers had motive and opportunity to commit securities fraud, to allege any particularized facts showing Citrix officers knew or were severely reckless in not knowing of any material misstatements or omissions, or to allege scienter as to Citrix. *Id.* Second, Defendants argue the Amended Complaint does not allege any actionable material misstatements or omissions. *Id.* at 24–35. Defendants assert that the challenged forward-looking statements are inactionable, the challenged statements of opinion are inactionable, challenged statements of fact were not materially false or misleading at the time they were made, and Defendants had no duty to disclose allegedly omitted information. *Id.* Third, Defendants argue the Amended Complaint does not allege loss causation as to the final corrective disclosure. *Id.* at 29–30.

### A.  Strong Inference of Scienter

Defendants first argue the Amended Complaint fails to allege Citrix officers had motive and opportunity to commit securities fraud because Citrix officers' stock sales undermine any inference of scienter. *Id.* at 16–20. Second, Defendants assert the Amended Complaint fails to allege particularized facts showing officers knew or were severely reckless in not knowing of any material misstatements or omissions because (i)

7

the allegations that officers made misstatements do not raise an inference of scienter, (ii) the allegations that officers were involved in Citrix's cloud transition do not raise an inference of scienter, and (iii) the allegations that officers timely disclosed negative results negates scienter. *Id.* at 20–23 Third, Defendants contend the Amended Complaint fails to allege scienter as to Citrix. *Id.* 23–24. Fourth, Defendants allege Plaintiffs' remaining arguments in support of scienter are meritless. *See* Reply, at 9–16.

        1.  <u>Motive and Opportunity</u>

        a.  <u>Stock Sales</u>

"Stock sales by insiders are only relevant to scienter when they are suspicious." *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 793 (11th Cir. 2010) (citations omitted). And they are suspicious if "the level of trading is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Id.* (citations omitted). Plaintiffs "bear the burden of showing that [stock] sales by insiders were in fact unusual or suspicious in amount and timing." *Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1335 (S.D. Fla. 2004). To determine whether stock sales are unusual or suspicious, a court may consider (1) the amount and percentage of shares sold, (2) the timing of the sales, and (3) the consistency between the sales and the insider's prior trading history. *In re Smith Gardner Sec. Litig.*, 214 F. Supp. 2d 1291, 1303 (S.D. Fla. 2002) (citations omitted). If a defendant sold more stock in the time period preceding the class period, "[t]his fact alone strongly cuts against an inference of scienter." *Mogenson v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1222 (M.D. Fla. 2014). And if "class-period stock sales were automatic sales made pursuant to Rule 10b5–1 trading plans," that too "negat[es] any inference of scienter . . . ." *Id.*

8

The Amended Complaint alleges Henshall sold $14.4 million in stock, Calderoni sold $4.3 million in stock, Shenkman sold $1.1 million in stock, Hough sold $1 million in stock, and Schmitz sold $3.4 million in stock. *See* Am. Compl. ¶¶ 242–46. Defendants contend that there is nothing suspicious about these sales and that Plaintiff has failed to plead any information regarding trading history before the class period. *See* Motion, at 16–17. Defendants first note that all common stock sold by Henshall, Hough, and Schmitz during the class period were sold pursuant to Rule 10b5–1 trading plans. *Id.* at 17–18. Second, Defendants state that Calderoni, Henshall, and Hough sold substantial amounts of stock in the 89 weeks preceding the Class Period—Calderoni and Hough sold more stock in the 89-week period prior to the class period than during the class period. *Id.* at 18. Third, Defendants explain that almost all officers sold stock at regular intervals throughout the class period—and Henshall and Shenkman sold stock on dates after the alleged corrective disclosure on April 29 and July 29 of 2021. *Id.* at 19. Fourth, Defendants submit that several officers increased or retained significant percentages of stock holdings during the class period. *Id.* at 19–20. For example, Henshall, Hough, and Schmitz increased holdings by 2.3%, 54.2%, and 17.1% respectively during the class period. *Id.* at 20. Calderoni and Shenkman reduced holdings by 32.7% and 5.8% respectively.

Plaintiffs respond that the class period stock sales were suspiciously timed because a majority occurred prior to the April 29, 2021 alleged corrective disclosure. *See* Response, at 33–35. Plaintiffs argue that 69% of Henshall's class period sales occurred before the disclosure, 100% of Calderoni's, 100% of Hough's, 50% of Shenkman's, and 100% of Schmitz'. *Id.* Second, Plaintiffs assert total stock sales from the period before and period during the class period shows total stock sold by defendants increased by

34.5% and 69% respectively. *Id.* Finally, Plaintiffs point out that the Rule 10b5-1 trading plans of Henshall, Hough, Shenkman, and Schmitz were all adopted during the Class Period and before negative news entered the market. *Id.*

Defendants reply reemphasizing that Plaintiffs fail to analyze stock sales in the period of time prior to the class period. *See* Reply, at 9–11. Defendants respond to Plaintiffs' argument regarding 10b5-1 plans adopted during the class period asserting that the fact they were adopted in the class period is immaterial because Plaintiffs have failed to show Citrix officers were aware of an impending decline in stock price at the time of adoption. *Id.* Next, Defendants point out that Plaintiffs' contention that collective stock proceed sales increased from 34% to 69% from the period before to the period during the class period is misleading. *Id.* Defendants explain that two officers did not assume their roles until shortly before the class period, so it cannot be suspicious that officers in the aggregate sold more stock during the class period than before with these two recent additions. *Id.* Finally, Defendants contend Plaintiffs wholly ignore the proportion of each Defendant's stock that was sold versus held and do not dispute that each officer increased or retained a significant percentage of stock holdings during the class period. *Id.*

The Court first considers the amount and percentage of stock sold by Defendants. As Defendants point out, Henshall, Hough, and Schmitz increased their holdings by 2.3%, 54.2%, and 17.1% respectively during the class period, whereas Calderoni and Shenkman reduced holdings by 32.7% and 5.8% respectively. *See* Motion, at 19–20. Courts have found that sales of 11% and 17% of an insider's stock holdings are insufficient to establish an inference of scienter. *See Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1336 (S.D. Fla. 2004) (citing *Acito v. IMERCA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995); *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001)). Here, three of five

defendants increased their stock holdings during the class period. This alone weighs against a finding of scienter under this factor. Shenkman only reduced his stock sales by 5.8%, which is below the threshold other courts have found insufficient to establish an inference of scienter. The only noteworthy stock sale is Calderoni, who reduced holdings by 32.7% during the class period. The Court finds these stock sales do not contribute to an inference of scienter for any individual defendant except Calderoni.

Second, the Court will assess the timing of the stock sales. Defendants note that all common stock sold by Henshall, Hough, and Schmitz during the class period were sold pursuant to Rule 10b5–1 automatic sale plans. *See* Motion, at 11–12. "[A]utomatic sales made pursuant to Rule 10b5–1 trading plans . . . negat[e] any inference of scienter . . . ." *Mogensen v. Body Cent. Corp.* 15 F. Supp. 3d 1191, 1222 (M.D. Fla. 2014). "[S]tock sales completed pursuant to a Rule 10b5–1 trading plan cannot support an inference of scienter unless the trading plan was adopted during the class period and the plaintiff alleges with particularity of facts showing that the defendant was aware of an impending price drop at the time the plan was adopted." *Id.* (citations omitted). Schmitz began his tenure at Citrix shortly before the class period commenced, so the fact his Rule 10b5–1 trading plan was adopted during the class period is of no significance. And the Amended Complaint does not contain any allegations about the other individual Defendants' Rule 10b5–1 trading plans and whether they were adopted with the awareness of an impending price drop.

Defendants next argue that almost all officers sold stock at regular intervals throughout the class period (Henshall selling 2,000–8,000 shares every month from April 2019 throughout class period, Hough selling 2,000 shares every quarter between June 10, 2020 and March 8, 2021, Schmitz selling 732–6,667 shares in several months, and

Shenkman selling 673 or 935 shares every month since October 2020 through class period). *See* Motion, at 13. The substantial variation in Henshall's and Schmitz' monthly trading does not support a finding of "regular interval" trading. What the Court does find concerning, as Plaintiffs argue, is the fact that the majority of class period sales occurred before the alleged April 29, 2021 corrective disclosure. *See* Response, at 27. Three of five individual Defendants completed 100% of their class period trading before the alleged corrective disclosure date. And the other two completed 69% and 50% of their trading before that date. The alleged corrective disclosure date occurs approximately two-thirds of the way through the class period. Thus, while Henshall and Shenkman's numbers do not raise suspicion, the other three—Calderoni, Hough, and Schmitz—do. Accordingly, with regard to these three individual Defendants, the Court finds this factor contributes to scienter.

Third, the Court must analyze the consistency between the class period sales and the insider's prior trading history. Calderoni, Henshall, and Hough sold substantial amounts of stock in the 89 weeks preceding the class period, with Calderoni and Hough having sold more stock in the preceding 89 weeks than during the class period. If a defendant sold more stock in the time period preceding the class period, "[t]his fact alone strongly cuts against an inference of scienter." *Mogenson v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1222 (M.D. Fla. 2014). Thus, that Calderoni and Hough sold more stock in the period preceding the class period strongly cuts against an inference of scienter as to them. Henshall sold 73,293 shares for $7.49m before the class period and 114,314 shares for $14.45m during the class period. *See* Am. Compl. ¶ 242. Yet Henshall also increased his total stock holdings by 2.3% during the class period. *See* Henshall Chart, Ex. HH, at 9 (DE [70-8], at 10). These two facts butt heads. On one hand, it appears

Henshall doubled his stock sales during the class period as compared to the period before. Yet Henshall also increased his total stock holdings slightly. In the absence of this latter fact, the fact that Henshall doubled his stock sales in the class period would contribute to an inference of scienter. However, because Henshall increased his total shares in Citrix, this cuts against that inference. Finally, with regards to Shenkman and Schmitz, they did not begin their roles at Citrix until shortly before the Class Period. Thus, their class period stock sales have no legitimate control period to be compared against. Therefore, the Court finds this factor does not weigh in favor of finding an inference of scienter for any of the individual Defendants.

Overall, the Court first finds the amount and percentage of shares sold during the class period by the individual Defendants weighs against an inference of scienter for all of the individual Defendants except for Calderoni. Second, the Court finds the timing of sales weighs against an inference of scienter for all of the individual Defendants. Even though 100% of the class period stock sales of Calderoni, Hough, and Schmitz occurred before the alleged corrective disclosure dates, Calderoni and Hough both sold more stock in the period preceding the class period, a fact that "strongly cuts against an inference of scienter." *Mogenson*, 15 F. Supp. 3d at 1222. And Hough and Schmitz both increased their holdings during the class period by 54.2% and 17.1% respectively and made those sales pursuant to automatic 10b5–1 trading plans. Finally, the Court finds the consistency between the class period stock sales and prior trading history for all individual Defendants weighs against an inference of scienter. In sum, the stock sales of the individual Defendants ultimately weighs against an inference of scienter.

2. <u>Knowledge or Severe Recklessness re Material Misstatements or Omissions</u>

a.  Citrix Officers' Own Misstatements or Omissions

In the Amended Complaint, Plaintiffs allege the individual Defendants made statements "to the investing public concerning [Citrix's] business model transition and financial results related thereto" while holding positions as "high-ranking officers and directors" that had signed SOX certifications. *See* Am. Compl. ¶¶ 234–36. Plaintiffs contend that by choosing to speak about this topic, the individual Defendants led investors to believe they had knowledge of such matters and thus had a duty to be truthful. Defendants argue that allegations a defendant "spoke intelligently" about a topic are insufficient to allege scienter. *See* Motion, at 14–15; *In re FLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1282 (S.D. Fla. 2017) (rejecting argument that company's executives' "[speaking] intelligently about GAAP, goodwill, and cash flow" provided "strong circumstantial evidence that they received specific information about undisclosed problems . . . ."). Second, Defendants contend that the individual Defendants' status as high-ranking officers and directors intimately aware of Citrix's financial condition, including its transition to the cloud, adds nothing to the inference of scienter because "[m]ere allegations that Defendants held senior management positions, had access to inside information, and therefore must have known of the falsity of certain statements is insufficient to plead scienter." *In re Smith Gardner Sec. Litig.*, 214 F. Supp. 2d 1291, 1303 (S.D. Fla. 2002) (citations omitted). Finally, Defendants contend that execution of certifications of Citrix's 10-Q and 10-K forms is insufficient to plead scienter. *See* Motion, at 15–16. Defendants note that SOX certification is "only probative of scienter if the person signing . . . was severely reckless in certifying the accuracy of the financial statements." *Mizzaro*, 544 F.3d at 1252 (citations omitted). However, Defendants assert, Plaintiffs do not allege any "glaring accounting irregularities" or red flags" that would meet this

standard.

Plaintiffs respond that an inference of scienter is supported because the individual Defendants made false statements about Citrix's cloud transition, a topic of paramount significance to Citrix. *See* Response, at 27. As an aside, this argument is wholly circular—Plaintiffs effectively argue that Defendants' intent to commit fraud is proven by the fact they did in fact commit fraud. Plaintiffs cite paragraphs 2, 29, 61, 85, 101, and 117 to support their contention. *Id.* Yet none of these paragraphs contain allegations that Defendants made false statements or representations concerning Citrix's cloud transition. *See* Am. Compl. ¶¶ 2 (stating in conclusory fashion that Defendants misled investors about transition and describing Citrix's historical focus on perpetual licenses); 29 (discussing how Citrix needed to transition to cloud and explaining distinguishing features of a subscription-based cloud model); 61 (stating how transition was discussed on Citrix conference calls and earning letters and noting Henshall's statements describing the process as requiring a "heightened level of coordination and alignment," and explaining the company's focus on helping customers migrate to the cloud); 85 (describing ways Citrix has been transforming its business model, discussing expected results of transition, and explaining causes of subscription revenue growth); 101 (discussing how transition is expected to result in more sustainable and recurring revenue growth and asserting belief that ARR is a key indicator of Citrix's health and trajectory); 117 (citing company's 2Q20 10-Q, explaining how Citrix's cloud transition regained momentum in the three months leading up to June 2020, announcing plans to discontinue offering new perpetual licenses in favor of cloud subscriptions, and projecting results from this planned transition).  None of these cited paragraphs allege that any of the Defendants misrepresented the progress or success of the transition, *i.e.* by stating the cloud transition is proceeding as planned,

is going well, has been successful, has not encountered any problems, etc. Rather, each of these statements contain general discussion of the reasons for the business model transition, the company's plans and efforts to execute the transition, and the projected results the transition will have on the company as a whole. The Court concludes none of these cited provisions in the Amended Complaint support the allegation that the individual Defendants made false statements regarding the transition.

Second, Plaintiffs argue the significance of Citrix's business model transition supports an inference of scienter. *See* Response, at 27. The Court agrees with Plaintiffs that false statements or representations concerning the status or success of the business model transition supports an inference of scienter because the transition was of such critical importance to Citrix as a whole. However, absent factual allegations buttressing this assertion, the significance of the transition alone cannot support an inference of scienter.

b.   Citrix Officers' Involvement in Cloud Transition

Plaintiffs allege in the Amended Complaint that the individual Defendants had scienter because they specifically acknowledged that they closely monitored the transition and its financial impact on Citrix. *See* Am. Compl. ¶ 237. Defendants contend that none of the twenty example statements include acknowledgment that Citrix officers were closely monitoring the cloud transition. *See* Motion, at 15–16. Moreover, Defendants add, "Defendants' public statements of how they reviewed revenue and bookings reports are . . . inadequate to establish scienter [where] there is no allegation that such reports demonstrated that the Company's guidance was false or misleading." *In re Royal Caribbean Cruises Ltd. Sec. Litig.*, 2013 WL 3295951, at *19 (S.D. Fla. Apr. 19, 2013). Defendants further argue that Plaintiffs fail to allege with particularity the information Citrix

officers actually received. *See* Motion, at 15–16. Finally, Defendants attack the argument that Defendants must have closely monitored the transition because their compensation was closely tied to its success. *See* Am. Compl. ¶ 238. Defendants note that "a personal financial incentive, standing alone, is insufficient to establish a strong inference of actual fraud." *Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enters., Inc.*, 572 F. App'x 713, 718 (11th Cir. 2014). Moreover, Defendants add, only "[w]hen financial incentives to exaggerate earnings go far beyond the usual arrangement of compensation based on the company's earnings, . . . may [they] be considered among other facts to show scienter." *Id.* at 1335. Defendants emphasize that the Amended Complaint does not allege what compensation plan the individual Defendants had agreed to nor whether any such plan was extraordinary.

Plaintiffs respond arguing that Defendants' positions and access to information concerning the transition support an inference of scienter. *Id.* at 27–30. Plaintiffs explain the individual Defendants, because of their high-ranking positions at Citrix, had access to and did review detailed metrics concerning the progress of the transition. *Id.* Moreover, Plaintiffs add, the individual Defendants controlled Citrix's public messaging to investors regarding the transition. *Id.* Plaintiffs contend that the content and context of the individual Defendants' specific statements regarding the transition and impact on Citrix's financial performance through SEC filings, press releases, earnings letters, and public conference calls supports an inference of scienter.

But as Defendants point out, "[m]ere allegations that Defendants held senior management positions, had access to inside information, and therefore must have known of the falsity of certain statements is insufficient to plead scienter." *Smith Gardner*, 214 F. Supp. at 1303. And, as discussed in the previous section, Plaintiffs fail to allege

17

particularized factual allegations to support their assertion that Citrix officers made false statements or omissions, or were severely reckless in making statements, regarding the transition. In *Primavera Investors v. Liquidmetal Technologies, Inc.*, 403 F. Supp. 2d 1151, 1158 (M.D. Fla. 2005), cited by Plaintiffs, the court found the plaintiffs to have adequately alleged that defendants had "issued numerous false and misleading public statements in press releases, corporate filings, and conference calls," which were supported "with specific facts derived from confidential witnesses, internal [company] documents, and the defendants' admissions and conduct." And in *In re Ebix, Inc. Sec. Litig.*, 898 F. Supp. 2d 1325, 1346 (N.D. Ga. 2012), cited by Plaintiffs, the court found the plaintiffs there to have adequately alleged the defendant made false statements or omissions, or was severely reckless in making statements, that the company was experiencing organic growth and hiring new sales personnel when both of those assertions were patently false. Here, upon review of the pertinent portions of the Amended Complaint cited by Plaintiffs, and for the reasons previously discussed, the Court is unable to discern any false or misleading public statements made by the individual Defendants, let alone specific facts in support derived from confidential witnesses, internal company documents, defendant admissions, or other sources. Accordingly, the Court finds that no inference of scienter can be drawn from the fact that the individual Defendants, in their roles as high-ranking executives, closely monitored the cloud transition.

### c.   Citrix Officers' Disclosure of Negative Results

Plaintiffs allege scienter is supported by the fact the individual Defendants admitted the same data they were closely monitoring showed more negative results regarding the transition then they had represented throughout the class period. *See* Am. Compl. ¶ 247.

Plaintiffs point to several cited statements in support. First, Henshall stated on April 29, 2021 that recognized revenue came in below expectations, despite strong metrics for bookings and ARR, due to lower than anticipated on-premises license contracts. *Id.* Second, Henshall stated on July 29, 2021 that the transition's pace was slower than expected at the onset of the pandemic, but has since gained momentum and is progressing well, but has not yet delivered on overall expected revenue. *Id.* Third, Henshall stated again that day that Citrix had not delivered new cloud subscriptions at the rate originally anticipated due to several factors and discussed subsequent actions taken to address these issues. *Id.* Fourth, Henshall stated that same day, that Citrix had faced sales execution challenges affecting the Q2 results due to several factors. *Id.* Fifth, Henshall acknowledged that same day that the revelations that emerged in that day's disclosure were a culmination of the realization by Citrix management that major changes were needed. *Id.* Sixth, Henshall stated that same day that Citrix could have done things better in managing its business model transition. *Id.* Seventh, on November 4, 2021, Calderoni stated that Citrix had underperformed its expectations due to numerous challenges and that he would analyze Citrix's operations to determine what steps should be taken to improve performance. *Id.* Again, the Court finds that the key assumption in Plaintiff's claim here—that "[the individual Defendants] had falsely and misleadingly [made representations concerning the transition] throughout the Class Period"—to not be supported by factual allegations. All the above-cited examples illustrate hindsight observations regarding Citrix's failure to meet expectations.

Defendants argue, and this Court agrees, that no identified admissions in the Amended Complaint constitute an admission that any officer knew their statements were false or misleading at the time they were made. *See* Motion, at 17. Rather, the Citrix

officers' statements acknowledged Citrix had underperformed expectations and identified and analyzed the factors they believed contributed to that underperformance. Plaintiffs fail to point to any factual allegations to support the argument that the individual Defendants made statements they knew were false or misleading at the time they were made. And "[t]hat Defendants revised and restated [their] previously reported financial figures, even to a great extent, provides no indication how or when Defendants became aware of the falsity of the original statements." *In re Med/Waste, Inc.*, 2000 WL 34241099, at *9 (S.D. Fla. Aug. 30, 2000). What Plaintiffs effectively seek to argue then is "the classic fraud by hindsight [theory] where a plaintiff alleges that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly." *In re Colonial Bancgroup, Inc. Sec. Litig.*, 9 F. Supp. 3d 1258, 1265–66 (M.D. Ala. 2014) (quoting *La. Sch. Emp.'s Ret. Sys. V. Ernst & Young, LLP*, 622 F.3d 471, 484 (6th Cir. 2010)) (internal quotes omitted). This argument should not and cannot support scienter. *See Med/Waste*, 2000 WL 34241099, at *8 (citing *Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 84 (2d Cir. 1999)).

Plaintiffs respond that the cited disclosures by Defendants amount to belated disclosures that contribute to a strong inference of scienter. *See* Response, at 30–31. Plaintiffs cite *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009) for the proposition that "admissions by [] individual defendants . . . directly and cogently tend to prove their state-of-mind at the time of their misleading statements and omissions, i.e., they are evidence that the defendants actually knew earlier that the course of action would turn out badly." But in that case, the plaintiff presented in its complaint "numerous contemporaneous documents, such as internal emails and memos, that support[ed] a strong inference that the defendants had a wrongful state of mind at the time of their

representations. The plaintiff also provide[d] admissions from the defendants themselves regarding their state of mind at the time of their representations (as found in the defendants' post-class period deposition testimony and emails)." *Id.* These "contemporaneous documents and post-period admissions both consistently [told] the same story: the defendants privately knew, at the time of the representations, that the [discussed company programs] would be disastrous for the company but continued to tout their benefits publicly." *Id.* Here, no such contemporaneous documents or admissions have been cited that show any individual Defendant possessed a wrongful state of mind at the time of their allegedly wrongful representations. Plaintiffs' attempt to analogize the individual Defendants' post-class period discussion of Citrix's underperformance to the post-class period deposition testimony and emails in *Lormand*, where it was revealed "defendants privately knew, at the time of the representations, that the [company programs] would be disastrous," 565 F.3d at 254, is unavailing.

And Plaintiffs' citation to *Owl Creek I, L.P. v. Ocwen Fin. Corp.*, 2018 WL 4844019, at *1 (S.D. Fla. Oct. 4, 2018) fails for the same reasons because, there, an individual defendant represented to shareholders the company was in compliance with a regulatory authority agreement, when at the same time, that individual defendant was aware of a compliance problem that he failed to investigate or disclose. Here, Plaintiffs have pointed to no factual allegations that show any individual Defendant made statements concerning the cloud transition, while at the same time, knowing the statement to be false. Next, Plaintiffs cite *Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*, 426 F. Supp. 3d 864, 874 (D. Kan. 2019) for the proposition that post-class period admissions regarding failure to accurately explain the "negative impact of [a company] transition" supports an inference of scienter. In *CURO*, "plaintiffs allege[d] that defendants effectively admitted that they

did a poor job explaining the near-term negative impact of the [company] transition," among other mistakes. *Id.* Defendants responded that plaintiffs had failed to show they committed fraud or knowingly made false statements. *Id.* The court reasoned that, because the defendants did not show the post-period statement was irrelevant, the facts supported an inference that defendants were at least reckless, supporting an inference of scienter. *Id. CURO* is a district court decision from the Tenth Circuit and is not binding on this Court. Moreover, the decision applies an exceptionally low standard that effectively equates relevance with supporting an inference of scienter, a rule understandably found nowhere in decisions of the Eleventh Circuit. Accordingly, the Court finds the individual Defendants' disclosure of negative results does not contribute to an inference of scienter.

### 3. Scienter as to Corporate Entity

A plaintiff must "create a strong inference that [a] corporate defendant . . . acted with the requisite state of mind. Corporations, of course, have no state of mind of their own. Instead, the scienter of their agents must be imputed to them. *Mizzaro*, 544 F.3d at 1254 (cleaned up). And as is the case here, "[b]ecause the allegations in this case related to allegedly fraudulent public statements, we look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like." *Id.* (cleaned up). Therefore, to allege scienter as to Citrix, Plaintiffs must plead (1) Citrix officers were "responsible for issuing the allegedly false public statements, and (2) were "aware of the alleged fraud." *Id.* at 1254–55. For the reasons discussed in the preceding sections, Plaintiffs have failed to meet this standard.

### 4. Remaining Scienter Arguments

a.  Executive and Director Departures and Reorganization

Plaintiffs allege that the disruption to Citrix's leadership on the heels of consecutive earnings misses and the ensuing vague explanation on sales execution issues contribute to a strong inference of scienter. *See* Response, at 30–32; Am. Compl. ¶¶ 203–218, 221, 224. Plaintiffs cite *In re Equifax, Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1245–46 (N.D. Ga. 2019), *In re Home Loan Servicing Sols., Ltd. Sec. Litig.*, 2016 WL 10592320, at *7 (S.D. Fla. June 6, 2016), and *City Pension Fund for Firefighters & Police Officers in City of Miami Beach v. Aracruz Cellulose S.A.*, 41 S. Supp. 3d 1369, 1397 (S.D. Fla. 2011) for the proposition that the sudden departure or resignation of high-ranking executives can be probative of scienter. Plaintiffs first allege Henshall stepped down as CEO and President of Citrix on October 4, 2021 to be replaced by Calderoni. *See* Response, at 31; Am Compl. ¶¶ 7, 15, 70, 218. Two days later, Plaintiffs contend, Citrix revealed to the market that Henshall had resigned from the board on October 1, 2021, Dr. Gopal had resigned from the board on October 4, 2021, and Citrix had reduced its board by 20%. *See* Response, at 31; Am. Compl. ¶¶ 7, 70, 218, 221. Second, Plaintiffs allege Defendants revealed Citrix needed significant changes including its sales organization, processes, and go-to-market priorities, which would require a reorganization of Citrix's sales team and leadership that would cause short-term disruptions before yielding tangible results. *See* Response, at 31; Am. Compl. ¶¶ 206–07. Henshall noted, according to Plaintiffs, the root cause of these problems included a host of sprawling internal company problems, proving Citrix's poor performance and inaccurate forecasting was not due to changed circumstances but systemic operational shortcomings. *Id.* ¶¶ 210–12. Third, Plaintiffs note that, following the class period, Citrix announced a significant restructuring and revealed Hough's removal as CPO and EVP. *Id.* ¶¶ 223–24.

Defendants respond that Plaintiffs fail to allege how the "circumstances of the resignation[s] . . . . suggest that intentional or reckless misconduct had occurred." *Equifax*, 357 F. Supp. 3d at 1245. "The fact that an executive resigned, on its own, does not support an inference of scienter." *Id.* In *Home Loan Servicing Solutions*, 2016 WL 10592320, at *7, the court found scienter was established as to a defendant who was "at the epicenter" of the business, was "forced to resign," and who regulatory documents showed was "engaged in improper transactions." That is not the case here for any of the individual Defendants. The only context Plaintiffs provide surrounding these resignations include alleged systemic operational shortcomings due to poor performance, internal company problems, and inaccurate forecasting, which necessitated a major overhaul of the company's sales organization and leadership. Even assuming the individual Defendants who resigned caused these adverse consequences due to poor management, this does not amount to intentional or reckless misconduct at the level of fraud.

b. <u>Magnitude of Citrix's Earning Misses</u>

Plaintiffs contend that the mere magnitude of Citrix's missed earnings weighs in favor of scienter. *See* Response, at 25. Several decisions cite the magnitude of fraud in weighing an alleged inference of scienter. *In re Eagle Bldg. Techs., Inc. Sec. Litig.*, 319 F. Supp. 2d 1318, 1326–28 (S.D. Fla. 2004) ("the more serious the error, the less believable are defendants' protests that they knew nothing"); *Pub. Emp. Ret. Sys. Of Mississippi v. Mohawk Indus., Inc.*, 564 F. Supp. 3d 1272, 1304 (N.D. Ga. 2021) ("The type and amount of fraud alleged here would not be hidden from the CEO . . . of the company"); *Sood v. Catalyst Pharm. Partners, Inc.* 2014 WL 1245271, at *7 (S.D. Fla. Mar. 26, 2014) (considering the "magnitude" of the misrepresentation in scienter

analysis). Here, according to Plaintiffs, the magnitude of Citrix's transition problems was manifested in two financial disclosures. *See* Response, at 25. First, Plaintiffs contend, on April 29, 2021, Citrix experienced a major drop in 1Q21 EPS, saw a 10% revenue drop, and realized 2Q21 earnings would badly miss projections. *Id.* Second, Plaintiffs add, 2Q21 results showed Citrix missed its top line and reported EPS 40% below consensus estimates, revised down its full year profit forecast, cut its EPS estimate, and revealed lower cash flow compared to 2020. *Id.*

Defendants reply that Plaintiffs' argument on this point is once again nothing more than the classic, and routinely rejected, "fraud by hindsight" argument. *See In re Nielsen Holdings PLC Sec. Litig.*, 510 F. Supp. 3d 217, 231 (S.D.N.Y. 2021) (finding allegation that projections "grossly underestimated the decline in revenue" insufficient because "the magnitude (or duration) of an adverse result does not provide an independent basis for scienter"); *In re Aegon N.V. Sec. Litig.*, 2004 WL 1415973, at *19 (S.D.N.Y. June 23, 2004) (rejecting argument that "that the amount of the 'miss' alone can satisfy scienter"). The Court agrees with Defendants and finds that, in the absence of other factors supporting scienter, the magnitude of Citrix's earnings miss is more probative of miscalculation than fraud. *See Smith v. NetApp, Inc.*, 2021 WL 1233354, at *9 (N.D. Cal. Feb. 1, 2021).

### c.  Signed SOX Certifications

Plaintiffs argue that the Sarbanes-Oxley certifications the individual Defendants signed supports an inference of scienter because the individual Defendants not only attested to the accuracy of Citrix's financial information, but also certified that Citrix's quarterly and annual SEC filings did not contain any false statements of material fact or material omissions. *See* Response, at 33. Plaintiffs cite *MAZ Partners LP v. First Choice*

*Healthcare Sols., Inc.*, 2020 WL 1072582, at \*5–7 (M.D. Fla. Feb. 14, 2020) for the proposition that SOX certifications "can form an actionable basis for a securities fraud claim," are not limited to claims regarding the accuracy of financial information, and may be indicative of scienter for material false statements. However, even applying this proposition to the facts, Plaintiffs fail to indicate exactly what representation directly or indirectly made through SOX certifications constitutes a false statement of material fact or material omission. *Supra* section III.A.2.a.

### d. Defendants' Other Financial Motivations

Plaintiffs argue Defendants were motivated to misrepresent and conceal Citrix's true condition in order to maximize the favorable terms of the March 2021 $2.25b Wrike acquisition, announced immediately after Citrix had affirmed is "2022 targets." *See* Response, at 33–35; Am. Compl. ¶¶ 149, 152. Plaintiffs allege Citrix reported positive 4Q20 and FY20 financial results and FY21 and 1Q21 guidance, *Id.* ¶¶ 153–161, and completed the acquisition a month before the alleged April 29, 2021, corrective disclosure, *Id.* ¶ 168.

Defendants reply that the acquisition, in which Citrix bought Wrike through an all-cash transaction, could not create a motive to inflate the value of Citrix stock. *See* Reply, at 11. Defendants contend that, because all-cash acquisitions cannot create a motive to inflate the value of company stock, they cannot form a basis to infer scienter. *Id.*; *see P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F. Supp. 2d 589, 615 (D.N.J. 2001) (rejecting argument that "transactions provided [issuer] a motive to keep its stock price high" because the issuer "was to pay cash for the proposed transactions, not stock, [and thus had] no incentive to keep [the] stock price fraudulently inflated."). The Court agrees with Defendants. Plaintiffs' allegation that Defendants were motivated

to misrepresent and conceal Citrix's true financial condition to further the acquisition is illogical in light of the fact that the acquisition was an all-cash transaction.

**IV.    CONCLUSION**

The Court finds the Amended Complaint does not allege facts sufficient to form a strong inference of scienter as to any of the individual Defendants or corporate Defendant. First, the factual allegations do not show the individual Defendants' stock sales are probative of motive and opportunity to commit securities fraud because there is nothing suspicious about any of the individual Defendants' stock sales. Second, the factual allegations fail to allege particularized facts showing the individual Defendants knew or were severely reckless in not knowing of any material misstatements or omissions because allegations regarding officer misstatements, allegations officers were involved in the company's cloud transition, and allegations officers timely disclosed negative results all fail to raise a strong inference of scienter. Third, because of the findings above, the Amended Complaint fails to allege a strong inference of scienter as to Citrix. Finally, Plaintiffs' other arguments concerning executive/director departures and reorganization, the magnitude of Citrix's missed earnings, the fact the individual Defendants signed SOX certifications, and the individual Defendants' other financial motivations all fail to raise a strong inference of scienter. For these reasons, the Court finds Plaintiffs' Amended Complaint fails to allege facts sufficient to satisfy the second element of a Section 10(b) securities fraud claim. Accordingly, it is hereby

**ORDERED AND ADJUDGED** that Defendants' Motion to Dismiss the Amended Complaint (DE [68]) is **GRANTED**. This **CAUSE** is hereby **DISMISSED WITH PREJUDICE**. The Clerk of Court is directed to **CLOSE** this case, and any pending motions are **DENIED AS MOOT**.

**DONE AND ORDERED** in Chambers, Fort Lauderdale, Florida, this 30th day of December 2022.

RAAG SINGHAL
UNITED STATES DISTRICT JUDGE

Copies furnished counsel via CM/ECF